**Earl J. PEOPLES, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 90–CF–300.

District of Columbia Court of Appeals.

Argued March 18, 1992.
Decided April 28, 1994.
As Revised May 3, 1994.

record. The Court may remand the case for

appropriate action.

1048

Jacqueline A. Baillargeon, Public Defender Service, with whom James Klein, Public Defender Service, Washington, DC, was on the brief, for appellant.

Albert A. Herring, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, Roy W. McLeese, III, and Debra Long–Doyle, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN, Acting Chief Judge,* and WAGNER, Associate Judge, and PRYOR,** Senior Judge.

WAGNER, Associate Judge:

Appellant, Earl J. Peoples, was charged in a twenty-two count indictment with various offenses in connection with a fire in the home of James and Ethel Mae Harrison in the 1500 block of D Street, S.E., which resulted in the death of Mrs. Harrison and severe injuries to Mr. Harrison and the other members of their family. Following a jury trial, appellant was found guilty of one count of arson (D.C.Code § 22–401 (1989)), one count of malicious destruction of property (D.C.Code § 22–403 (1989)), one count of felony murder while armed (flammable liquid) (D.C.Code §§ 22–2401, –3202 (1993 Supp.)), one count of second degree murder while armed (D.C.Code §§ 22–2403, –3202 (1993 Supp.)) (the lesser included offense of the charged offense, first degree murder while armed), six counts of assault with a dangerous weapon (D.C.Code § 22–502 (1989)) (the

---

* Judge FERREN was an Associate Judge of this court at the time of argument. His status changed to Acting Chief Judge on March 18, 1994.

** Former Chief Judge ROGERS was a member of the division that heard oral argument in this case. After her departure from the court, Senior Judge PRYOR was selected by lot to replace her.

lesser included offenses of six charged counts of assault with intent to kill while armed), five counts of malicious disfigurement while armed (D.C.Code §§ 22–506, –3202 (1989 & 1993 Supp.)) and five counts of mayhem while armed (D.C.Code §§ 22–506, –3202 (1989 & 1993 Supp.)).[1] The court sentenced appellant to an aggregate prison term of seventy-three years to life. Appellant argues for reversal on the grounds that the trial court erred in (1) failing to instruct the jury that specific intent to maim is an element of mayhem while armed, (2) denying motions for judgment of acquittal for the offenses of mayhem while armed and malicious disfigurement, and (3) denying a motion for mistrial based on prosecutorial misconduct. Appellant also contends that several of the offenses for which he was convicted merge, requiring that some of the convictions be vacated. We affirm appellant's convictions except that we remand for the trial court to vacate the merged counts consistent with this opinion.

## I.

The evidence disclosed that appellant and Bonita Harrison (Miss Harrison) had a romantic relationship for several years prior to the night of the fire and that in October, 1985, they had a son, Earl Peoples, Jr. (Earl, Jr.). Miss Harrison resided with her parents, along with Earl Jr., her sister and brother, Patricia and Michael Harrison, and her nephews, Anthony and Ronald Harrison, Larry Henderson, and Stanley White. Appellant visited Miss Harrison at the family's home, and consequently, he knew the other members of the household who were living there.

In the spring of 1986, the relationship between appellant and Miss Harrison began to deteriorate. In July of that year, appellant threatened to kill Miss Harrison and Earl, Jr. and to blow-up her home and everyone in it if he ever caught her with another man. Appellant had threatened Miss Harrison previously. Patricia Harrison testified that ap-

pellant told her that he would kill her sister, Bonita, if he ever caught her "fooling around" or talking to other men. Miss Harrison ended the relationship in August 1986 after appellant chopped off some of her hair and wounded her hand with the scissors. According to Miss Harrison's testimony, during this incident, appellant threw Earl, Jr. on the bed. Subsequently, appellant took Earl, Jr. from the babysitter's home and told Miss Harrison that he had thrown the child into the Anacostia River. However, Miss Harrison found the child at the home of appellant's parents.

Miss Harrison testified that appellant called her the night before the fire and asked to visit. She declined the invitation, but appellant came to her home anyway. While there, he picked up a telephone extension and overheard Miss Harrison speaking first to a female and then to a man on the telephone. After accusing her of speaking with another man, appellant left the house. About 9:00 p.m. that same evening appellant visited a friend, Michael Lee, who lived in the Harrisons' neighborhood. According to Lee, appellant complained that he overheard Bonita Harrison "talking love" with a man on the telephone. Appellant left Lee's house between 2:30 and 3:00 a.m.

Patrice Pitts and her boyfriend, Michael Harrison, Bonita Harrison's brother, testified that they were sitting in a car behind the Harrisons' home at about 6:00 a.m. that same morning when they saw appellant in the alley. Although Miss Harrison's car was parked in front of the house, she and Earl, Jr. were not at home. Both Pitts and Michael Harrison recalled seeing appellant twisting a rag, an event linked by other testimony to the igniting of the fire. Michael Harrison called out to appellant by name and asked him to come to the car. Although appellant said, "Yeah, hold on a minute," he headed toward 16th Street, S.E. Moments later there was an explosion at the Harri-

---

1. Originally, appellant was charged with one count of arson, one count of malicious destruction of property, one count of first degree premeditated murder, one count of felony murder, five counts of mayhem while armed, six counts of assault with intent to kill while armed, and five counts of malicious disfigurement while armed. He was also charged with one count of assault with intent to kill and one count of cruelty to children, but these counts were severed from the other charges and tried separately.

sons' home, and Miss Pitts and Michael Harrison saw the house go up in flames. At trial both of these witnesses identified a rag recovered from the vestibule of the home as looking like the one they saw appellant twisting that morning.

Two other people saw appellant near the Harrisons' home at or near the time that the fire erupted. Sherman Hill, a friend of Michael Harrison and Patrice Pitts, testified that while he (Hill) was getting out of his car that morning, he saw appellant. Alisa Owens, one of appellant's friends, testified that at about the time of the fire she saw appellant running by her "real fast" while she was sitting outside her apartment building, which is around the corner from the Harrisons' home. About five minutes later, Miss Owens heard sirens and saw fire trucks around the Harrisons' home.

James Harrison testified that on the morning of the fire he heard his daughter, Patricia, who had been sleeping downstairs, yell that she smelled something burning. When Mr. Harrison went down to investigate, he opened the door, and "something ... like a bomb went off" and "fire went straight up right over [his] head into the house."

Tim May, who qualified as an expert witness in fire investigations, testified that the fire started in the vestibule of the home after a flammable liquid accelerant had been poured on the floor. He testified that a partially burned rag had been recovered from the vestibule which could have been used as a wick to ignite the fire. It was Mr. May's opinion that the fire had been set intentionally because his investigation revealed that a flammable liquid ignited by an open flame had been used to start the fire. He also explained that the fire first smoldered in the vestibule enclosure, consuming most of the oxygen there before erupting into the house when an inflow of oxygen caused a backdraft explosion.

Janet Carpenter, one of appellant's close friends, testified that she questioned him about the fire days later, and he admitted that he had set the fire in such a way that no one would know who did it. Mrs. Ethel Mae Harrison died as a result of injuries sustained in the fire. James Harrison, Anthony Harrison, Patricia Harrison, Larry Henderson, and Stanley White suffered severe burns.[2]

In evaluating appellant's insufficiency of the evidence arguments, the nature and effect of the victims' injuries is significant; therefore, we recount them in some detail. Dr. Michael Boyajian, who treated Anthony Harrison, Larry Henderson, and Stanley White, testified that Anthony Harrison suffered second and third degree burns over 55 percent of his body, including deep burns to his scalp, face, and neck. Anthony Harrison underwent four operations in October 1986 and doctors had to remove all of the cartilage in both of his ears. His face was permanently deformed, and he will never have hair again. He suffered permanent scarring and relatively minor, but somewhat measurable, limitations of motion in his fingers and elbows. Anthony Harrison testified that he can no longer stretch his arm out all the way or play football, although he can play basketball and baseball.

Dr. Marion Jordan, James Harrison's treating physician, testified that he sustained "27-½ percent second[,] and possibly third degree[,] burns" on his buttocks and arms and that he is scarred permanently. Dr. Jordan also testified that this victim sustained impairments of his bodily functions as a result of the burns. He explained that the severe scars resulting from the second degree burns have a tendency to draw and contract, thereby closing off the sweat and oil glands and resulting in a long-term problem with production of oil, which gets trapped and causes acne-type sores.[3] Dr. Jordan

2. Ronald Harrison escaped from the house unharmed.

3. Dr. Marion Jordan, Director of the Burn Center at the Washington Hospital Center, was qualified as an expert witness in general surgery and burn surgery. Generally, he testified, *inter alia*, that human skin is considered an organ system

of the body, that first degree burns take off the epidermis, the outer surface of the skin, and that second degree burns burn into, but not necessarily all the way through, the second level of the skin, the dermis. The distinguishing characteristic of a second degree burn is injury to nerve endings, which causes variations in the level of pain or sensation to the victim, as well as injury

testified that the burn across James Harrison's back from shoulder to shoulder has impaired his motion.

Dr. Jordan testified that Patricia Harrison suffered second and third degree burns over 39 percent of her body, including her legs, arms, torso, and hands. She had at least five operations involving surgical incisions of the burn injuries and skin-grafting. According to Dr. Jordan, Patricia Harrison's scarring resulted in permanent impairment of her sweat and oil glands and hair roots. He also stated that the burns to her hands and arms extended across joints, including the knee and elbow, and that significant scarring has impaired the functioning of those joints. Patricia Harrison testified that as a result of the burns she sustained she is no longer able to grip or hold things the way she did before, and therefore, she is unable to work at her previous occupation as a hair stylist.

Larry Henderson, who was an infant when the fire occurred, sustained second and third degrees burns over 20 percent of his body, particularly the upper part. According to his treating physician, Dr. Michael Boyajian, Larry has permanent scars, although he has otherwise recovered from his injuries. Lana Harrison, Larry's aunt, testified at trial and pointed out his injuries to the jury. She also testified that the doctor wanted to do more

skin grafting on Larry to release the pressure from the scarring and to smooth the skin.

Stanley White sustained second degree burns to his lower extremities, and he will have permanent scars as a result. He testified that as a result of his injuries, particularly those to his knees and ankles, he has difficulty playing sports. Dr. Michael Boyajian testified that Stanley's burns healed without any operations.

## II.

 Appellant argues that the trial court erred in failing to instruct the jury that specific intent to maim is an element of the crime of mayhem. The elements of this offense are not prescribed by the applicable statute, which simply sets forth the penalty for its commission.[4] *See* D.C.Code § 22–506. This court has held that absent a statutory definition of a crime, the common law definition for the offense controls.[5] *Perkins v. United States*, 446 A.2d 19, 23 (D.C.1982) (citing *Clark v. United States*, 418 A.2d 1059, 1061 (D.C.1980)). In *Perkins*, after tracing the genesis of the crime of mayhem, this court concluded that specific intent is not an element of the offense.[6] 446 A.2d at 24–25.

---

to various levels of the hair roots and sweat and oil glands. Dr. Jordan testified that given proper circumstances, a second degree burn of relatively small size will heal on its own, but the dermis, where there are elastic fibers which allow the skin to stretch over moving joints, does not rejuvenate. Dr. Jordan explained that where there are third degree burns, the heat penetrates completely through the dermis and into the muscle. He said that when the dermis has been destroyed, significant problems occur because elastic fibers, sweat and oil glands, and hair is eliminated from these areas. Dr. Jordan stated that "a third degree burn, while it can be healed, will not have major portions of the function that were there before."

4. D.C.Code § 22–506 reads:
 Every person convicted of mayhem or of maliciously disfiguring another shall be imprisoned for not more than 10 years.

5. D.C.Code § 49–301 (1990) provides:
 The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general acts of Congress not locally inapplicable in the Dis-

trict of Columbia, and all acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except insofar as the same are inconsistent with, or are replaced by, some provision of the 1901 Code.

6. For a detailed discussion of the origin of the crime of mayhem in the state of Maryland as derived from the common law of England and the so-called Coventry Act, *see Perkins, supra,* 446 A.2d at 23–25; *see also United States v. Cook,* 149 U.S.App.D.C. 197, 462 F.2d 301 (1972). Appellant argues that the D.C. penalty statute incorporates a definition of mayhem from the Coventry Act, which became part of D.C. common law in 1801. *See* D.C.Code § 49–301 (1990); *see also Williams v. United States,* 569 A.2d 97, 99 (D.C. 1989); *De Forest v. United States,* 11 App.D.C. 458, 466 (1897). He contends the Coventry Act requires a specific intent. He argues that Coventry Act mayhem, with its specific intent requirement, replaced ancient common law, general intent mayhem, in this jurisdiction. The ancient common law definition of mayhem was: "Vio-

■ Nevertheless, appellant argues that this court is at liberty to address anew whether specific intent was intended by the legislature as an element of mayhem under D.C.Code § 22–506 and whether pertinent laws in Maryland, incorporated into the District of Columbia law by D.C.Code § 49–301, mandated a specific intent element for the crime. Appellant contends that any language in *Perkins* purporting to define mayhem is dicta because the only issue before the court was whether malicious disfigurement, also covered by D.C.Code § 22–506, requires specific intent. It is true, as appellant points out, that the issue raised by the appellant in *Perkins* was whether the trial court erred in refusing to instruct the jury that specific intent is an element of the offense of malicious disfigurement. 446 A.2d at 21. However, the government had countered that argument by contending, *inter alia,* that under § 22–506, mayhem and malicious disfigurement had "merged into a single class of general intent crimes, differentiated only by the type of injury inflicted." *Id.* at 24. In rejecting the government's argument, this court concluded in *Perkins* that § 22–506 is a sentencing statute which incorporates two discrete common law crimes, each still serving "discernible functions," with mayhem requiring only a general intent, and

malicious disfigurement requiring a specific intent to disfigure. *Id.* at 24–25. In that connection, the court gave the following explanation for the difference in the nature of the intent required:

> The act of mayhem, however, is so egregious that sufficient intent justifiably may be inferred from malicious and wilful commission of the act.... In contrast, disfigurement can result from a relatively minor assault. The specific intent requirement accordingly serves to separate the less serious, though criminal, act which results in a permanent injury from the calculated and truly heinous act of mayhem.

*Id.* at 25 (citing *Brown, supra* note 6, 84 U.S.App.D.C. 222, 171 F.2d 832). The determination of the intent element for mayhem was essential to the court's disposition of the government's efforts to establish in *Perkins* that the two crimes covered by § 22–506 had merged into a single general intent crime. Therefore, we regard the decision in *Perkins* to be binding precedent on the intent issue raised here.[7] *See M.A.P.,* supra note 285 A.2d at 312.

Subsequent to the decisions in *Brown* and *Perkins,* this court has continued to hold that the crime of mayhem under D.C.Code § 22–506 requires only "a general intent to do the

lently depriving another of the use of such of his members as may render him the less able in fighting, either to defend himself, or to annoy his adversary." 4 BLACKSTONE, COMMENTARIES, 205 (1769); *see also Perkins, supra,* 446 A.2d at 23 (describing ancient law of mayhem). Our case law holds otherwise. Our case law has expressly held that the Coventry Act did not "displace the common law of mayhem, but rather extended the crime to include intentional disfigurement and provided an increased penalty for intentional maiming. Thus, in English law, the crime of disfigurement required specific intent, while mayhem did not." *Perkins, supra,* 446 A.2d at 24; *see also Edwards v. United States,* 583 A.2d 661, 669 (D.C.1990); *Wynn v. United States,* 538 A.2d 1139, 1145 (D.C.1988); *Brown v. United States,* 84 U.S.App.D.C. 222, 223, 171 F.2d 832, 833 (1948).

7. Appellant argues similarly that the decision in *Brown,* upon which we relied in *Perkins,* holds no precedential value because the precise issue he raises here was not squarely presented to the court. *See Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1924); *see also Ford v. United States,* 533 A.2d 617, 624 (D.C.

1987) (en banc). Specifically, in this regard, appellant contends that the issue of the legislative intent respecting the nature of the intent required for the crime of mayhem was not raised by the parties or decided by the court in either *Brown* or *Perkins.* As previously noted, the determination of the elements of the offense, including the intent element, was determinative of the merger issue raised by the government in *Perkins.* In resolving it, the court had to look to the common law, and determined that "[t]here is no evidence from the language of the statute or the legislative history that the drafters intended to change or delete the common law requirements when they drafted § 22–506." *Perkins,* 446 A.2d at 24. While the court did not address the issue of the Congressional intent underlying § 22–506 in *Brown,* the court was required to consider whether specific intent to maim was an element of mayhem. *Brown,* 84 U.S.App. D.C. at 223, 171 F.2d at 833. In determining that it was not, the court concluded that "[t]he common law definition applies, and it does not include a specific intent." *Id.* at 223, 171 F.2d at 833. We are bound by the court's decision in *Brown* as well as *Perkins. See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

injurious act...." *Edwards, supra* note 6, 583 A.2d at 668; *see also Wynn, supra* note 6, 538 A.2d at 1145. These authorities are binding until overruled by the en banc court, and appellant's arguments to the contrary are not persuasive.[8] *See M.A.P., supra,* 285 A.2d at 312. Therefore, we hold that the trial court did not err in declining to instruct the jury that the specific intent to maim is an element of the offense of mayhem.

### III.

■ Appellant contends that even if specific intent is not an element of mayhem, his convictions on these counts must be reversed because the evidence was insufficient to support them. In support of this argument, appellant points out that the evidence of mayhem consisted entirely of burn injuries and that there was no evidence from which a reasonable mind could find beyond a reasonable doubt that the injuries sustained rendered an organ of the body wholly useless or greatly impaired.

■ In assessing the claim of insufficiency, we view the evidence in the light most favorable to the government, "leaving to the trier of fact the resolution of credibility and the right to draw justifiable factual inferences." *In re R.H.M.,* 630 A.2d 705, 707 (D.C. 1993); *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987); *Shelton v. United States,* 505 A.2d 767, 769 (D.C.1986). A motion for judgment of acquittal must be granted if, when viewed against this standard, the evidence "is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." *Curry,* 520 A.2d at 263; *Shelton,* 505 A.2d at 769. When the trial court denies the motion, our standard of review is the same. *See R.H.M.,* 630 A.2d at 707; *Curry,* 520 A.2d at 263.

■ The essential elements of the crime of mayhem are: "(1) that the defendant caused permanent disabling injury to another; (2) that he had the general intent to do the injurious act; and (3) that he did so willfully and maliciously." *Edwards, supra* note 6, 583 A.2d at 668 (citing *Wynn, supra* note 6, 538 A.2d at 1145).[9] Appellant argues that the evidence was insufficient to prove a permanent, disabling injury. At early common law, "mayhem directed its focus toward physical disablement rather than comeliness or completeness in bodily functioning." *Cook, supra* note 6, 149 U.S.App.D.C. at 198, 462 F.2d at 302. However, "[n]ot even at common law did the injury mayhem required need to be completely destructive of one of the human senses." *Id.* at 199–200, 462 F.2d at 303–304. The court has stated that "[t]he mayhem statute seeks to protect the preservation of the human body in its normal functioning and the integrity of the victim's person from permanent injury or disfigurement." *McFadden v. United States,* 395 A.2d 14, 18 (1978); *see also Edwards, supra* note 6, 583 A.2d at 669; *Perkins, supra,* 446 A.2d at 24–25.

Viewing the evidence in the light most favorable to the government, we are persuaded that it was sufficient to support the jury's determination that each of the surviving victims suffered permanent injuries, which rendered a member or organ of the body either "wholly useless," or left its usefulness "greatly impaired." *See Cook, supra* note 6, 149 U.S.App.D.C. at 200, 462 F.2d at 304. We need not repeat in detail in this part of the opinion, the more complete descriptions of the victims' injuries recounted in Part I of the opinion. Briefly summarizing, the evidence disclosed that Anthony Harrison's burns resulted in "measurable limitations of his fingers and elbows" and limitation of motion in all of his joints. Additionally, the skin layer containing the hair follicles was burned as a result of which he is permanently incapable of ever growing hair on those

---

8. In light of these authorities, we must also reject appellant's argument that specific intent "should be" an element of the offense of mayhem.

9. The trial court gave an instruction for mayhem which required the jury to find that the government had proven beyond a reasonable doubt that: (1) appellant committed an act which caused injuries to the specific victim; (2) the injuries were permanent; (3) the injury rendered an organ of the body, either wholly useless or left the organ's usefulness greatly impaired; and (4) appellant acted willfully and with malice. *Compare with* Criminal Jury Instructions for the District of Columbia, No. 4.14 (4th ed. 1993) (current standard instruction for mayhem).

surfaces. According to the evidence, James Harrison suffered a significant loss of touch perceptions caused by the formation of scar tissue over nerve endings. His ability to regulate body heat is impaired because of his diminished capacity to sweat due to those glands being closed by scar tissue and skin sores. He has experienced a loss of oil secretion functions because of the closure of oil glands by scar tissue. James Harrison's injuries also resulted in an impairment of motion in the back and shoulders.

Patricia Harrison also suffered a significant loss of touch perception due to scar tissue formation. She suffered impairment of her ability to regulate body heat, due to closed sweat glands, skin sores and loss of oil secretion functions. She now has impairment of motion in her arms, legs, and hands. Larry Henderson sustained such severe burns to his forehead and scalp that skin grafting was required to resurface the wounds. Finally, according to the evidence, Stanley White sustained third degree burns which resulted in problems with his ankle and knees which impairs his ability to play sports.

There was expert testimony that the skin is an organ system of the body, and that second and third degree burns greatly impair, if not completely destroy, the normal functioning of that organ system. Dr. Jordan, an expert witness, also testified that second and third degree burns result in permanent impairment of the skin organ system including injury to various levels of the hair roots and sweat and oil glands. There was evidence that all of the surviving victims suffered permanent scarring and second and third degree burns. The evidence established that each of them suffered burns that permanently damaged that organ system. Therefore, the jury could reasonably find that the burns which each of them suffered rendered an organ of the body either "wholly useless" or left its "usefulness greatly impaired." *Cook, supra* note 6, 149 U.S.App. D.C. at 200, 462 F.2d at 304. Accordingly,

we conclude that the evidence was adequate to support the convictions for mayhem.

## IV.

■ Appellant also argues that the evidence in this case was insufficient to support his convictions of malicious disfigurement while armed. Specifically, he contends that the evidence was insufficient to establish that he had the requisite "specific intent to permanently disfigure." *See Edwards, supra* note 6, 583 A.2d at 668; *Perkins, supra,* 446 A.2d at 21.[10] He contends that the jury could not infer the requisite intent from his deliberate act in starting the fire with a flammable liquid. The government responds on appeal, as it did in the trial court, that specific intent to bring about the result of permanent disfigurement can be found from circumstantial evidence. When appellant set the fire, the government argues, he either knew, or reasonably should have known, that the victims would be permanently disfigured, and that he set the fire with the intent to cause those injuries. This evidence, according to the government, permitted the inference of specific intent to maliciously disfigure.

■ Specific intent can be inferred from the circumstances surrounding the disfiguring act. *See Curtis v. United States,* 568 A.2d 1074, 1075 (D.C.1990). In *Curtis,* the victim's lover threw a bottle of draining fluid at him, which burned him and caused permanent disfigurement. The evidence showed that Curtis selected the chemical likely to be most harmful to the victim. When she learned of the victim's painful injuries, Curtis said "Well, did you think I would let him walk out of my life just like that." *Id.* The court found this evidence sufficient to support a finding of specific intent to permanently disfigure the victim.

In the case before the court, the evidence disclosed that appellant deliberately set fire to the Harrisons' home, using a flammable liquid accelerant, in the early morning hours while those inside were sleeping. It is rea-

---

**10.** The elements of malicious disfigurement are (1) that the defendant inflicted an injury on another; (2) that the victim was permanently disfigured; (3) that the defendant specifically intended to disfigure the victim; and (4) that the defendant was acting with malice. *Edwards, supra* note 6, 583 A.2d at 668.

sonable to infer that appellant knew that the people inside the house would sustain grievous burn injuries if they escaped alive. Appellant had previously threatened to blow up the house and everyone in it if Miss Harrison ever left him. All of these circumstances evidence appellant's intent sufficiently to permit the jury to find that appellant had the requisite specific intent to support his convictions of malicious disfigurement. *See Curtis, supra,* 568 A.2d at 1076.

## V.

Appellant's next argument for reversal is that the trial court erred in denying his motion for mistrial based on the prosecutor's improper closing and rebuttal arguments. Appellant contends that the prosecutor improperly vouched for the testimony of key government witnesses, commented on appellant's failure to testify, misstated the law, and argued facts not in evidence.

 In evaluating a claim of so-called prosecutive error, we are guided by well-defined considerations.

> First, we must determine whether any or all of the challenged comments by the prosecutor were improper. If we conclude that they were, we must then, viewing the remarks in context, "consider the gravity of the [impropriety], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case."

*McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (quoting *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989)) (other citations omitted). When appellant preserves his objection, this court will affirm, absent substantial prejudice, *i.e.,* whether we can say "with fair assurance after pondering all that has happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *accord, McGrier,* 597 A.2d at 41; *Irick v. United States,* 565 A.2d 26, 32 (D.C.1989). If a

defendant fails to preserve the objection at trial, we will reverse only if the error has "so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial." *Irick,* 565 A.2d at 32. We turn to consideration of appellant's claims of prosecutive error in light of these standards.

### a. *Comments on the Veracity of the Witnesses*

 Appellant argues that the prosecutor vouched for the credibility of key witnesses who placed appellant at the crime scene at the critical time. He cites the prosecutor's remarks with reference to the testimony of Patrice Pitts and Michael Harrison. In that connection, the prosecutor stated essentially that the witnesses candidly admitted that at the time they saw appellant, they were behind the house "cooking up their drugs." The challenged remarks occurred in the following way:

> Patrice Pitts and Michael Harrison were sitting right back here in this car. And as they told you ... they had a drug problem and they told you that the reason they were sitting back there, is because they were ... getting high. Sherman Hill was getting high as well.
>
> \* \* \* \* \* \*
>
> They told you how they ... saw him.... They sat back there in the car and they called over to [appellant]. They sat there—and they told you, they were very honest about it, they told you how they were cooking up their drugs—
>
> \* \* \* \* \* \*
>
> They told you ... what they were doing. They told you they were back there using drugs, and that they were cooking them up, about ready to use them.

Appellant objected to the comment. Viewed in context, it seems clear that the prosecutor referred only to the witnesses' candor in openly admitting their drug use. Assuming error in the phrasing of the comment, it was harmless.[11] *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248.

---

11. Similarly, we find any error harmless with respect to appellant's challenge to the prosecutor's remarks that the same two witnesses held

nothing back and "[t]hey didn't get up on the stand and lie to you."

■■■ Appellant also challenges that portion of the argument during which the prosecutor used a metaphor provided by one of the witnesses, Patrice Pitts. Essentially, she said that "everybody has a cut card," and that she would not "lie and say somebody did something or [that] they were somewhere if [she] didn't see them there." In commenting on Miss Pitts' use of these words, the prosecutor explained that it was a principle by which Miss Pitts and the other witnesses, who were admittedly drug users, lived which precluded their lying about facts that would implicate an innocent person of a crime. Miss Pitts had testified also that "I'm not going to implicate nobody and nothing if they didn't do it first of all. . . . I don't want to be in jail, I don't want to see nobody else in jail." Again, having reviewed the argument in context, it appears that the remarks were tied sufficiently to a discussion of the evidence and that they do not rise to the level of transgressions warranting reversal.[12]

### b. *Comments on Appellant's Failure to Testify*

■■■ Appellant points to two separate times where he contends that the prosecutor improperly commented on his failure to testify. At one point, the prosecutor, in discussing the intent necessary to convict for assault with intent to kill, stated:

> One of the things—in determining whether or not the defendant had the specific intent to kill the people in that household, one thing we can't go and look into his mind and find out exactly what he was thinking. We can't do that. But you can look at all the surrounding circumstances in determining whether or not that was his intent at the time.

In discussing premeditated murder, the prosecutor stated:

> The government has charged the defendant with premeditated murder. Now again, just as I talked to you about specific intent before, you can't look into somebody's mind and you can't look into the

defendant's mind and find out what— whether or not he premeditated it; whether or not there was something that he planned before that house went up in smoke, before the people were injured and before someone died.

Appellant also contends that the prosecutor pointed her finger at him in an accusatory manner when she repeated that "you can't look into the defendant's mind and find out what—whether or not he premeditated it." Appellant contends that the prosecutor's comments and actions improperly directed the jury's attention to his failure to testify.

■■■ The test for whether such comments warrant reversal is whether the prosecutor's language was manifestly intended to, or was of such character that the jury would naturally and necessarily take it to be a comment on his failure to testify. *Bowler v. United States*, 480 A.2d 678, 683 (D.C.1984). The prosecutor's remarks here were made in connection with explaining the element of specific intent. The record reveals the remarks were not manifestly intended to, nor were they of such a character, that the jury would naturally take them to be comments on a failure to testify. Rather, the remarks pointed out to the jury, consistent with the trial court's instructions, that one could not scrutinize the operations of the human mind in order to determine intent, but one could ascertain intent from the surrounding circumstances. The prosecutor argued that the jury could consider, for example, appellant's knowledge of the likelihood that the Harrison residence would be occupied at the time he set the fire, his knowledge about who was living there, his threat to blow up the residence, the use of fire fueled by a flammable accelerant to burn the residence, and the time he had to reflect on his actions before starting the fire. The prosecutor's remarks did not stray beyond permissible limits. Moreover, the trial court instructed the jury that appellant was not required to testify and that they should not speculate on his reasons

---

**12.** Appellant also claims that the prosecutor inflamed the jury by stating that the parents of the witnesses had not raised them to be drug abusers and that they had attempted to instill certain values in them. Viewed in context, the argument

was not inflammatory and clearly not a basis for reversal. We also find no grounds for reversal based on the prosecutor's alleged "multiple and irrelevant comments to inflame and sway the jury."

**1058**

for not doing so, thus mitigating any possible harm.

#### c. *Mischaracterization of the Law*

■ Appellant argues for reversal on the grounds that the prosecutor misstated the law in opening statement and in closing remarks. The comments were these:

> [A]s a result of that mayhem, what we plan to show is that some parts of their body is [sic] not, are not as functional as they were prior to the, to the offense.

> \* \* \* \* \* \*

> Mayhem basically means ... the Judge is going to give you the full instruction of it, but ...—what it means is that some part of your body is less functional, less useful, than it was prioer [sic] to. . . .

Appellant objected, and the trial court admonished the prosecutor in the presence of the jury to be careful to be accurate when commenting to the jury on the law and that the court would instruct the jury on the law. The prosecutor also said that mayhem "makes your body appreciably less functional or less useful—or bodily part, less useful than it was prior to the act that caused the injury." The court denied appellant's request for an instruction on the law on mayhem at that time. Appellant also complains that the prosecutor mischaracterized the law in stating to the jury that malicious disfigurement involves making a person "less attractive" and that mayhem means basically that "some part of your body is less functional."

We have cautioned that the trial court should intervene promptly to correct serious misstatements of the law. *Thomas v. United States*, 557 A.2d 1296, 1304 (D.C.1989). Here, the trial court promptly sustained appellant's objection to the statements complained of and immediately alerted the jury that the court would instruct them on the law. The court's actions avoided any harm. Even the prosecutor had pointed out to the jury that the court would provide instructions on the law and suggested the incompleteness of his own reference. Moreover, while the prosecutor's remarks were imprecise and incomplete, the trial court eliminated any possible harm by instructing the jury correctly on the elements of both crimes, including the nature and character of the injuries required to prove them.

#### d. *Arguments of Facts Not in Evidence*

■ Appellant argues that the prosecutor mischaracterized evidence of the victims' injuries. We have examined each of these claims and find that few require comment. The prosecutor's reference to Mr. White's legs "growing back" was an obvious mistake, which is unlikely to have inflamed the jury. Otherwise the prosecutor's comments about Mr. White's injuries were either based on, or inferable from the evidence, and clearly not prejudicial. Appellant also states that, contrary to the prosecutor's argument, there was no evidence that James Harrison suffered back pain when he tried to bend down or that he could not bend the way he used to because of burn injuries to his back. Although there was no specific testimony that this victim suffered pain, the arguments about the matter could be inferred from the description of his injuries by Dr. Jordan.

■ Appellant is also correct that there was no evidence that Larry Henderson lost elasticity in his hand as the prosecutor argued. However, the court instructed the jury when defense counsel objected that it was their recollection of the facts which controlled. Therefore, despite the misstatements, it is unlikely that the remarks were so prejudicial as to require reversal.[13]

### VI.

Finally, appellant argues that several of the offenses for which he was convicted merge. First, he contends that the arson conviction must be vacated because it merges with the felony murder while armed conviction. *See Doepel v. United States*, 434 A.2d 449 (D.C.), cert. denied 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981); *Leasure v. United States*, 458 A.2d 726, 730–31 (D.C.

---

**13.** We reject appellant's argument that the cumulative effect of the claimed prosecutive errors

substantially swayed the verdicts against him.

1983). He contends that one of the two murder convictions must be vacated. See *Thacker v. United States,* 599 A.2d 52, 63 (D.C.1991). He also argues that his convictions on five of the charges of assault with a dangerous weapon merge with his convictions on the charges of malicious disfigurement while armed. The government does not contest these arguments.

Appellant also argues that his convictions of mayhem while armed merge with his convictions for malicious disfigurement while armed. This argument fails under our decision in *Byrd v. United States,* 598 A.2d 386 (D.C.1991) (en banc). In *Byrd,* we held that a pure fact-based analysis of a double jeopardy issue does not accord with recent Supreme Court decisions. *Id.* at 390. Although the Double Jeopardy Clause bars multiple punishments for a single offense when a single act violates more than one criminal statute, a defendant may be convicted of each offense and may be sentenced for both if the legislature so intended. *Edwards, supra* note 6, 583 A.2d at 669. In

*Perkins* this court dispositively concluded that malicious disfigurement and mayhem are "two discrete crimes, with their differing degrees of intent, [which] still serve discernible functions." 446 A.2d at 25. Therefore, we conclude that the mayhem and malicious disfigurement .counts do not merge.

For the foregoing reasons, the judgments of conviction appealed from hereby are affirmed, except insofar as we remand to the trial court with instructions to vacate appellant's convictions for the merged counts. Thereafter, the court may resentence appellant to effectuate its original sentencing intention.

*So ordered.*