**Rodney BROWN and Leonard Bishop, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 96–CF–824, 96–CF–1095, 00–CO–1055.**

District of Columbia Court of Appeals.

Argued March 2, 2004.[1]

Decided Nov. 1, 2007.

1. Following our decision in *Wilson–Bey v.* *United States,* 903 A.2d 818 (D.C.2006) (en

banc), appellant Bishop filed a supplemental brief on August 15, 2007, raising a new claim of instructional error, to which the govern-ment responded on September 5, 2007. We consider that claim as well as those raised in appellants' initial briefs.

Thomas T. Heslep, for appellant Rodney Brown.

Jenifer Wicks, for appellant Leonard Bishop.

Suzanne G. Curt, Assistant United States Attorney, for appellee.

Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, Roy W. McLeese III, Joan Draper, and Geoffrey Barrow, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and TERRY, Senior Judge.[2]

RUIZ, Associate Judge:

Appellants Rodney Brown and Leonard Bishop appeal their convictions arising from a shooting which resulted in the death of Andre Newton and injuries to Carrington Harley, Keith Williams, Michael Toland and Joey Payne. Each appellant was convicted of one count of first-degree murder while armed, four counts of assault with intent to kill while armed (AWIKWA), one count of mayhem while armed, five counts of possession of a firearm during a crime of violence (PFCV), and one count of carrying a pistol without a license. Both appellants contend that the trial court abused its discretion by failing to balance their Sixth Amendment right to present a defense when it upheld the Fifth Amendment privilege against self-incrimination of a proffered defense witness, by failing to grant a mistrial after the jury twice announced its inability to render a verdict and the judge gave an anti-deadlock instruction, and by admitting a redacted version of appellant Brown's out-of-court admission rather than severing their trials. Appellant Bishop also argues that the trial court committed reversible error in (1) denying his motion for judgment of acquittal as to the charges of mayhem while armed and assault with intent to kill, (2) allowing the jury to hear evidence of appellant's drug possession prior to the shooting, (3) instructing the jury on aiding and abetting, and (4) denying his motion claiming ineffective assistance of counsel. We affirm.

## I. FACTUAL BACKGROUND

The convictions in this case arose from a shooting that took place on November 25, 1994, in the 600 block of 46th Place, S.E., in Washington, D.C. (in an area known as "Simple City").

Andre Newton and Carrington Harley were close friends. Harley testified that in the summer of 1994, his friend Newton began to change, when Newton started selling drugs for Roy Tolbert. On November 25, 1994, Newton asked Harley to accompany him to a shopping mall, but instead of going to the mall, they drove to Tolbert's apartment in Maryland. While in the apartment, Newton told Tolbert that he did not "want to go up there by [him]self," and Tolbert gestured toward Harley saying, "He'll go with you." Tolbert then took Newton and Harley to 600 block of 46th Place, S.E., with two bags of drugs and two guns. When they arrived, Newton placed one of the bags near a trash can and the other one by an apartment building.

---

2. Judge Terry was an Associate Judge of the court at the time this case was argued. His status changed to Senior Judge on February 1, 2006.

Three people approached Newton and asked him about Tolbert. Two of them bought what appeared to be marijuana from Newton. When another man drove up and announced that the police were nearby, Newton handed Harley his gun and Harley stashed the guns (the guns that Tolbert had given to him and Newton) behind a wall. They then began to walk away from the stash.

Keith Williams testified that he was friends with appellants Brown and Bishop from June 1989 until his incarceration in 1992, and then again after his release in 1994. He testified that on November 25, 1994, he went to Alabama Avenue after work to meet with two friends. His friends, however, were not there, so he went to 46th Place, S.E., where he met with Joey Payne, Michael Toland and "Deion." Williams testified that he saw appellants Bishop and Brown with drugs on the hood of appellant Brown's car, while Andre Newton and Carrington Harley stood nearby. Appellants then moved Brown's car, and, at Toland's behest, Deion moved his van which was parked nearby. Joey Payne insisted that they leave immediately and he, Williams, and Toland began walking towards Payne's car. According to Williams, as the group walked to the car, he turned to watch Newton and Harley, who were walking behind them. Williams also saw appellants run through a "cut" near the parking lot and begin shooting at Newton and Harley. Williams testified that appellant Bishop fired first with what appeared to be a .44 magnum revolver with a long barrel, with a booming noise. Brown's gun, which was not as loud, fired rapidly. Harley testified that at that point he and Newton began to run, with appellants pursuing them. Harley was hit in the chest and fell.

James Jones lived in an apartment at 620 46th Place, S.E. He testified that on November 25, 1994, at approximately 5:20 p.m., he and his wife were returning home, and as he parked his truck, he heard gunshots and saw appellant Brown standing in the parking area firing a pistol. He saw a man fall to the ground and then saw appellant Brown walk over to the man and fire several more shots into his body. Jones testified that he had known Brown for seven or eight years and identified him in court. Jones stated that he saw another man with Brown but could not identify him.

Carol Jeffries also lived in an apartment on the 600 block of 46th Place, S.E. Jeffries testified that she knew appellants from the neighborhood and identified them in court. She described how, immediately after she heard gunfire on November 25, 1994, appellants ran into her apartment. Brown was "very emotional, very nervous"; he hid a "square gun with a clip" under her sofa, and quickly left by jumping off her balcony. Bishop, who stood still and looked "shocked," ran out the front door. Jeffries further testified that several days after the shooting, she overheard appellant Brown say to a group (that did not include appellant Bishop): "Man, I punished them niggers, coming on my turf." (This statement had been redacted to eliminate a possible reference to appellant Bishop).

Forensic evidence included medical testimony and records of injuries to Harley's hip, stomach, prostate, rectum, groin and urethra. A bullet found in the sole of his boot months after the shooting was consistent with bullets used in a .44 magnum revolver. Newton, who died from multiple gunshot wounds, had been shot in the back of the leg (consistent with his having been running away from the shooters) and had a contact wound in the front of the neck (consistent with having been shot with the muzzle of the gun touching him).

## II. ANALYSIS

### A. *Defense Witness's Fifth Amendment Privilege*

Appellants argue that the trial court violated their Sixth Amendment right to present a defense when it upheld a defense witness's Fifth Amendment privilege against self-incrimination. One of appellants' theories proposed at trial was that someone else had shot and killed Newton and injured the others, in retaliation for a previous shooting. According to the defense theory, Roy Tolbert had shot at a car with two people from a rival group, known as the Alabama Avenue Crew, six weeks prior to the shooting in this case. In support of their theory, appellants proffered that Michael Raymond would testify that in the fall of 1994, he was riding in a car with two members of the Alabama Avenue Crew when Tolbert shot at them. Appellants asserted that Raymond and his fellow passengers would have been aware of the well-known association in the drug trade between Newton and Tolbert, leading members of the Alabama Avenue Crew to shoot Newton to get even. At trial Raymond asserted his Fifth Amendment privilege, stating that he had a pending case involving drug distribution and that he also was an identified target of an ongoing federal investigation involving the Alabama Avenue Crew, the Simple City Crew and related drug activity in the area. Raymond argued that the testimony appellants wanted to elicit from him would link him to people and places that could incriminate him in aspects of the government's ongoing investigation. Before trial, the court recognized the relevance and importance of the proffered testimony, *see Winfield v. United States*, 676 A.2d 1 (D.C. 1996), but it disallowed any questioning of Raymond as violative of his Fifth Amendment privilege when the issue surfaced at trial. The trial court considered the possibility of limiting the scope of Raymond's questioning, but concluded that it "could not see how [it] could narrow it down" to preclude the possibility "that these people [in the car] are not involved in the ... investigation" because otherwise "it does provide [a link]" between Raymond and the subject of the federal investigation.

Appellants argue that the trial court erred in granting a blanket Fifth Amendment privilege to Raymond and that it failed to analyze the conflict between appellants' Sixth Amendment right to present a defense and Raymond's Fifth Amendment privilege. They assert that, as a result, this court should remand for a new trial "with the *Carter* procedure in place," referring to our en banc opinion in *(George) Carter v. United States*, 684 A.2d 331, 344–45 (D.C.1996), which provides a process by which the trial court determines the possibility of future prosecution of a proffered defense witness and evaluates the importance of the proffered testimony to the defense against the government's willingness (or lack thereof) to grant immunity to the witness when such immunity is sought by the defense. We find no such error. Because of the ongoing government investigation, prosecution against Raymond was a possibility. The trial court considered limiting Raymond's testimony, but reached the conclusion that anything Raymond had to say useful to the defense would provide a link to the subject of the government's on-going investigation, which already identified him as a target. Although normally a witness's Fifth Amendment privilege is to be asserted and determined on a question-by-question basis, *see Littlejohn v. United States*, 705 A.2d 1077, 1083 (D.C.1997) (citations omitted), given the information provided to the trial court as to the nature of the testimony appellants sought from Raymond and the scope of the government's then-pend-

ing investigation, we conclude that the trial court did not commit error in granting a blanket Fifth Amendment privilege because there was no relevant non-inculpatory testimony that Raymond could have provided on appellants' behalf. *See id.* Furthermore, we reject appellants' argument that the case should be remanded based on our decision in *Carter.* Appellants did not request immunity for Raymond pre-trial as required by *Carter, see* 684 A.2d at 345 (requiring that request for immunity be made pre-trial; "[o]nly for good cause shown should this pre-trial procedural requirement be altered") and, as a result, the remedy sought by appellants is not available.

## B. *Anti-deadlock Instruction*

▮ Appellants argue that the trial court coerced the verdict by giving an anti-deadlock instruction encouraging the jury to continue deliberating while leading jurors to believe that tapes of requested testimony would be produced in a timely manner for use in rendering a verdict. The decision to give an anti-deadlock instruction is committed to the "sound discretion of the trial court." *See Coleman v. United States,* 515 A.2d 439, 453 (D.C. 1986) (citations omitted). A verdict rendered after an anti-deadlock instruction "may be overturned only if, from all the surrounding circumstances, it appears the [anti-deadlock] charge was coercive." *Id.* (citations omitted).

The record shows that on Friday, March 22, 1996, after 15 hours of deliberation, the jurors sent a note stating that they could not reach a unanimous decision. The trial court denied appellants' mistrial motions and told the jury to continue deliberating. The following Monday afternoon, the jurors sent a second note stating that they still were unable to reach a unanimous

decision. The next day, the trial court gave the "Gallagher" instruction.[3] *See Winters v. United States,* 317 A.2d 530, 539 (D.C.1974) (en banc) (Gallagher, J., concurring). Throughout deliberations, the jury made several requests for transcripts of the testimony of various defense and government witnesses. The trial court explained that the transcripts were not ready, but that tapes may soon be available. The jury continued asking for the tapes as they deliberated, but the tapes were not delivered. Finally, the jury sent a note asking specific questions regarding the identification and location of various buildings that had been mentioned during trial. Approximately forty minutes after receiving a response, the jury reached a unanimous verdict.

▮ In evaluating the potential for jury coercion, this court examines (1) "the inherent coercive potential of the situation before the court," and (2) the actions of the trial court "to determine whether [the] actions exacerbated, alleviated or were neutral with respect to coercive potential." *Davis v. United States,* 669 A.2d 680, 683 (D.C.1995) (quoting *Harris v. United States,* 622 A.2d 697, 701 (D.C.1993)). Here, the trial court gave the "Gallagher" instruction—a "softer" version of the *Winters* anti-deadlock instruction—when the jury had been deliberating for a relatively short period of time given the seriousness of the charges. After being given the instruction, the jury deliberated for an additional three days during which it continued to ask for the tapes. In lieu of the tapes, which were unavailable, the jury asked specific questions that, according to the note, would allow them to "form a just and unanimous decision." Shortly after receiving answers (agreed upon by appellants) to their specific questions, the jurors

---

**3.** Appellant Bishop had requested the instruc- tion, but appellant Brown had opposed it.

reached a unanimous verdict. Nothing in the record suggests that the anti-deadlock instruction that was given induced any member of the jury "to abandon his [or her] honest conviction as a pure accommodation to the majority of the jurors or the court." *Winters*, 317 A.2d at 532. Given the sequence of events in the course of the jury's deliberations—notably the continuation of lengthy deliberations after receiving the anti-deadlock instruction—it is more reasonable to infer that upon receiving the specific information sought, the jury was able to reach a unanimous verdict. Under these circumstances, there is no basis to infer that the jury's verdict was coerced.

## C. *Bishop's Motion for Judgment of Acquittal of Mayhem and AWIKWA*

Appellant Bishop argues that the trial court erred in denying his motion for judgment of acquittal on the ground that the government's evidence was not sufficient to prove beyond a reasonable doubt that he was guilty of the charges of mayhem while armed (Carrington Harley) and assault with intent to kill (Joe Payne, Keith Williams and Michael Toland).

■ "In reviewing a claim of evidentiary insufficiency, the appellate court views the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact. A motion for judgment of acquittal should only be granted if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Lay v. United*

*States*, 831 A.2d 1015, 1026 (D.C.2003) (quoting *Gibson v. United States*, 792 A.2d 1059, 1065 (D.C.2002)).

### 1. *Mayhem*

■ The elements of mayhem are: (1) that the defendant caused permanent disabling injury to another, (2) that he had the general intent to do the injurious act, and (3) that he did so willfully and maliciously. *See Peoples v. United States*, 640 A.2d 1047, 1054 (D.C.1994 (quoting *Edwards v. United States*, 583 A.2d 661, 668 (D.C.1990)). Appellant Bishop argues that the evidence was insufficient to prove that Carrington Harley suffered a permanent, disabling injury. We have stated that "[t]he mayhem statute seeks to protect the preservation of the human body in its normal functioning and the integrity of the victim's person from permanent injury or disfigurement." *McFadden v. United States*, 395 A.2d 14, 18 (D.C.1978) (citation omitted).[4]

At trial, Harley testified that he suffered six to eight gunshot wounds in his right hip area, and that one round hit his prostate gland and another shattered his rectum. Harley was forced to use a colostomy bag for a year, and, at the time of the trial, he still required a catheter. In addition, Harley's surgeon, Dr. Golocovsky, testified that Harley had permanent scars to his abdomen and abdominal wall, and that his abdominal muscles were permanently weakened. As a result, Harley faced an elevated risk of future intestinal, urinary, and sexual dysfunction. Viewing the evidence in the light most favorable to the government, we conclude that the trial

---

4. At early common law, "mayhem directed its focus toward physical disablement rather than comeliness or completeness in bodily functioning." *United States v. Cook*, 149 U.S.App. D.C. 197, 199, 462 F.2d 301, 302 (1972). However, "[n]ot even at common law

did the injury mayhem required need to be completely destructive of one of the human senses." *Peoples*, 640 A.2d at 1054 (quoting *Cook*, 149 U.S.App. D.C. at 198, 462 F.2d at 302).

court did not err in denying appellant Bishop's motion for judgment of acquittal as to the mayhem charge because the evidence sufficed to prove beyond a reasonable doubt that Harley suffered "permanent injuries," which rendered at least one organ of the body—the stomach—"greatly impaired" in its functioning. *See Peoples,* 640 A.2d at 1054 (quotation marks and citation omitted).

### 2. *Assault with Intent to Kill While Armed*

■ Appellant Bishop challenges three of his AWIKWA convictions claiming that the government failed to prove that Joey Payne, Kevin Williams and Michael Toland were in the "zone of harm" proximate to the intended victims at the time of the shooting such that appellant's intent to kill them could be inferred from his shooting at the intended targets, Newton and Harley. *See Walls v. United States,* 773 A.2d 424, 434 (D.C.2001). Specifically, Bishop argues that "there was simply no evidence of where they were when the gunshots went off." He asserts that the only evidence was the hearsay statement heard by Kevin Williams, who testified about what Payne had told him. Williams (who had explained to the jury the relative positions of the shooters and the shooting victims) testified that before the shooting started, Payne told him and Toland to leave immediately, and they started walking towards Payne's car. As they walked, Williams turned to watch Newton and Harley, who were walking behind them. When the shooting started, Williams was hit in the right arm and a bullet grazed Payne's back. As a result of the shooting barrage, Newton was killed and Harley was seriously injured. Viewing the evidence in the light most favorable to the government, we conclude that the evidence presented sufficed to permit the jury reasonably to infer that Williams, Payne and Toland were in the zone of danger, and that under the concurrent intent doctrine, appellant Bishop had the requisite intent. *See id.*

### D. *Evidence of Uncharged Drug Possession*

■ During trial, the government introduced evidence that appellant Bishop had drugs on the hood of appellant Brown's car prior to the shooting. Bishop argues that evidence of the uncharged drug possession should not have been introduced because the government did not establish possession by "clear and convincing evidence," and because the evidence did not fall within one of the exceptions recognized in *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85, 89 (1964) ("[E]vidence of another crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged."). *Drew* does not apply, however, to evidence of uncharged criminal conduct "where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Johnson v. United States,* 683 A.2d 1087, 1098 (D.C.1996) (en banc). Bishop's drug possession took place immediately prior to the shooting, and the government presented it in order to "complete the story of the crime ... by placing it in the context of nearby and nearly contemporaneous happenings." *See Holmes v. United States,* 580 A.2d 1259, 1266 (D.C.1990) (quoting *Williams v. United States,* 549 A.2d 328, 333 (D.C.1988)). The evidence helped to explain the reason why appellants, as part of a turf war over drugs, "would approach two strangers and immediately shoot them in the back." Moreover, any prejudicial effect from the evidence did not substantially outweigh its probative value given the close temporal

relationship between the uncharged conduct and the shooting. *See Wilson v. United States*, 690 A.2d 468, 474 (D.C. 1997) (Ruiz, J., concurring). As a result, we perceive no error by the trial court.

### E. *Redacted Hearsay Statement and Appellants' Motions for Severance*

The government moved to allow appellants' neighbor, Carol Jeffries, to testify to a redacted form of a statement that she overheard appellant Brown make a few days after the shooting. As Ms. Jeffries walked by a group of men (that did not include appellant Bishop), appellant Brown said, "Man, we punished them niggers, coming on our turf." In order to avoid a *Bruton* issue, the government proposed a redacted version of the statement. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Jeffries would replace the plural pronouns, "we" and "our" with the singular pronouns "I" and "my" to avoid prejudice against appellant Bishop, who could not cross-examine Brown (who did not take the stand) and could not be imputed with admission by silence because he was not present at the time Brown made the statement. At trial, immediately after Jeffries testified to the redacted version of Brown's statement, the trial judge instructed the jury that it could not use the statement "in any way in determining the guilt or innocence of" appellant Bishop. Bishop objected to the admission of the statement and moved for severance, which the trial court denied.

 "It is well established that this court will reverse the denial of a motion for severance only upon a clear showing that the broad discretion accorded the trial court in this regard has been abused." *See Payne v. United States*, 516 A.2d 484, 489 (D.C.1986) (citation omitted). Even where evidence against one defendant is "greater than that against the other, severance is not required if the evidence against the other is substantial and compelling." *See Sweet v. United States*, 438 A.2d 447, 452 (D.C.1981) (citation omitted).

 We disagree with Bishop's argument that the trial court erred in denying his motion for severance given that the evidence against him was *de minimis* when compared to the evidence against his co-defendant because he was not present when appellant Brown made the inculpatory statement. The evidence against Bishop was not *de minimis*. Bishop was identified by Williams, who testified that Bishop ran into the parking lot and was the first to begin shooting with a revolver. A second witness (Jones) who identified appellant Brown as one of the shooters, testified that he saw a second man stand "side by side" with him and described how they both left the area together. Finally, Jeffries testified that she knew Bishop from the neighborhood and described how he and Brown ran into her apartment immediately after the shooting. Jeffries saw Brown, who was "very emotional and very nervous," hide a gun under her sofa, while Bishop looked "shocked" and ran out the front door. The trial court did not abuse its discretion in denying Bishop's motion to sever because the evidence against him was not *de minimis*.

 Appellant Brown also contends that the trial court abused its discretion in denying his motion for severance because, under the rule of completeness, he was entitled to present the statement in its true form given that the redacted version of the statement was highly prejudicial to him. We disagree that the redaction was unfair to Brown. "The rule of completeness is violated ... only where admission of the statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the declarant." *Butler v. United States*, 614 A.2d 875, 882 (D.C.1992) (quoting *United States v. Kaminski*, 692 F.2d 505,

522 (8th Cir.1982)). "This court has made clear that the denial of a request to introduce additional portions of a statement under the rule of completeness should be reversed only if the trial court has abused its discretion." *Id.* (citation omitted).

Brown argues that the redaction distorted his statement's meaning because the original statement's reference to "we" and "our" is ambiguous while the redacted version, "Man, *I* punish these niggers for coming on *my* turf," is "an unambiguous admission of culpability." In denying appellant's motion for severance, the trial court reasoned that:

> The "we" implies ... that [appellant Brown] is still present, and I would note that the statement was made allegedly in the same area of the murder scene. I don't think that changing it to "I" on reflection significantly alters his role when you consider the quantum of proof of the Government against Mr. Brown individually as one of the shooters ... I am satisfied that whether you use "we" or "I," that it clearly shows that he is present, and it is an admission on his part even if he used the term "we." It is certainly inculpatory under those circumstances either way.

Although we recognize that by changing the pronoun "we" to "I," the statement more clearly inculpates Brown, nothing in the redacted portions of the statement "substantially exculpat[es]" him, *id.*[5], and because introduction of the unredacted statement would have infringed on his co-defendant's rights, we find no abuse of discretion in the redaction.

### F. *Aiding and Abetting Instruction*

■ ■ After oral argument, appellant Bishop raised an additional challenge: that the trial judge gave an aiding and abetting instruction that we subsequently held to be an erroneous statement of the law in *Wilson–Bey, supra* note 1. As the claim is made for the first time on appeal, we review for plain error. *See, e.g., Brown v. United States,* 881 A.2d 586, 593 (D.C. 2005). Even if we were to assume that it should have been obvious to the trial judge that the instruction was erroneous, *see Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), appellant cannot shoulder his burden (and indeed he has not attempted to do so) of showing that the error affected his substantial rights and that the verdict has resulted in manifest injustice. The aiding and abetting instruction applied only to the charge of first degree premeditated murder, and was relied upon by the government in closing solely for the purpose of arguing to the jury that it did not matter if the jury could not determine whose bullet—Bishop's or Brown's—actually killed Newton. As far as premeditation and intent are concerned, however, the government did not rely on aiding and abetting liability; its theory was that Bishop came armed to the scene and repeatedly shot at a number of people, killing Newton and injuring four others. The defense developed at trial, on the other hand, that Bishop was not present at all. The jury clearly credited the government's theory as it found Bishop guilty of AWIKWA of Harley, Williams, Toland and Payne. On this record, there is no plain error.

### G. *Ineffective Assistance of Counsel*

Appellant Bishop makes several claims against trial counsel's performance. He

---

**5.** At most, counsel could have argued, using the sports analogy in Brown's brief, that by saying "we punished" Brown was merely making a collective boast, not admitting personal participation. In light of the evidence that Brown was seen shooting by two witnesses, that argument is hardly likely to have swayed the jury.

argues that counsel failed to present exculpatory witnesses, failed to object to hearsay evidence, misled the jury in opening and closing statements, and failed to object to the admission of a prejudicial photograph or to request a cautionary instruction. After a hearing on Bishop's § 23–110 motion, the motions judge concluded that defense counsel had provided "exemplary defense representation" and found no merit in Bishop's claim that he had been prejudiced by defense counsel's representation.

■ We apply the familiar two-prong standard for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, appellant much show that his trial counsel committed errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, appellant must prove prejudice "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In evaluating counsel's performance, the reviewing court "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052 (citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)); *accord Hill v. United States,* 489 A.2d 1078, 1080 (D.C.1985), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1980, 90 L.Ed.2d 663 (1986). "Trial tactical decisions generally do not result in a finding of ineffective assistance of counsel." *Zanders v. United States,* 678 A.2d 556, 569 (D.C.1996). This court will not second-guess trial counsel's strategic choices because "[m]any alternative tactics are available to defense attorneys and their actions are often the products of strategic choices made on the basis of their subjective assessment of the circumstances

existing at trial." *Id.* (quoting (*Wayne*) *Carter v. United States,* 475 A.2d 1118, 1123 (D.C.1984)). "Mere errors of judgment and tactics as disclosed by hindsight do not, by themselves, constitute ineffectiveness." *Lane v. United States,* 737 A.2d 541, 549 (D.C.1999) (quoting *Curry v. United States,* 498 A.2d 534, 540 (D.C. 1985)). On the prejudice prong, appellant must show that "but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The reviewing court need not address both prongs of the *Strickland* test if appellant does not meet the burden of one or the other showing. *See id.* at 697, 104 S.Ct. 2052.

■ Appellant Bishop argues that his trial counsel failed to present testimony by Drucilla Williams, who was identified as a potential *Brady* witness given her description of one of the shooters in a statement she gave to the police. During the § 23–110 hearing, defense counsel testified that she made "the tactical decision not to call Ms. Williams" after considering reports by the police that Williams appeared to be under the influence of drugs when she made her statement. Trial counsel testified that, at the time, she believed that the case had gone well, and that "we wanted to confine our defense to witnesses that we didn't think would be impeached or cross examined extensively to give the jury some additional information that would be hurtful to us." Importantly, the hearing disclosed that defense counsel thoroughly investigated the case by interviewing witnesses, including Williams. Based on the information provided by the government and her own investigation, defense counsel made the tactical decision not to call Williams as a witness. Given our deference to defense counsel's tactical decision

after a thorough investigation, *see Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc) (citing *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052), we agree with the trial court's conclusion that counsel's decision not to present Williams as a defense witness did not constitute deficient performance.

▪ We also agree with the trial court's rejection of appellant Bishop's argument that defense counsel was deficient in failing to object to Keith Williams's hearsay testimony that Payne said he had been shot in the back. As the trial court noted, Bishop could not show the requisite prejudice because other evidence placed Payne in the "zone of danger" which, under a theory of concurrent intent, supports Bishop's conviction of assault with intent to kill Payne. Moreover, counsel may have prudently assumed that Payne's statement, made immediately after he was shot, would be admitted as an excited utterance or present sense impression. Neither prong of *Strickland* is satisfied.

▪ As to Bishop's claim that his attorney was ineffective for promising to the jury during opening statement that there would be evidence of the real perpetrator, the record shows that—consistent with the court's pretrial ruling that Raymond's testimony was relevant and admissible—defense counsel did make efforts to present evidence in support of that theory. As we have already discussed, these efforts were foiled by Raymond's assertion of his Fifth Amendment privilege during trial, which the court sustained. Adjusting to this development, counsel argued in closing that, except for the testimony of Williams (who counsel claimed was biased against appellants), there was no evidence to show that

Bishop was one of the shooters who killed Newton and injured Harley, Payne, Toland and Williams.

▪ "The purpose of an opening [statement] is to give the broad outlines of the case to enable the jury to comprehend it." *Bailey v. United States*, 831 A.2d 973, 981 (D.C.2003) (quoting *Government of the Virgin Islands v. Turner*, 409 F.2d 102, 103 (3d Cir.1968)). Here, trial counsel presented an opening statement which reflected her understanding of the evidence to be presented at trial.[6] As the trial progressed, and Raymond asserted his Fifth Amendment privilege, counsel shifted the focus of her closing argument to point out weaknesses in the government's case (*e.g.*, lack of motive). As a result, we agree with the trial court's conclusion that counsel's opening statement and closing argument were reasonable under prevailing professional norms.

▪ Finally, we agree that appellant Bishop failed to establish his claim that counsel was ineffective for failing to object to admission of a mug shot he claims was prejudicial. As the trial court noted, it is unclear from the record whether the photograph was introduced into evidence, and—more importantly—appellant has not shown how significant prejudice resulted from the introduction of the photograph if it was admitted. Although the trial court invited appellant to submit additional support for this claim, he failed to do so. As a result, the claim was properly denied under the *Strickland* test.

\* \* \*

As both parties agree, on the facts of this case each appellant's five PFCV con-

---

**6.** Appellant does not argue that counsel should have anticipated Raymond's invocation of his Fifth Amendment privilege and resolved it before making an opening statement.

 

victions merge. *See Nixon v. United States,* 730 A.2d 145, 152–53 (D.C.1999). We remand for the limited purpose of vacating, for each appellant, four of the PFCV convictions, and resentencing as appropriate. In all other respects, the judgments are affirmed.

*So ordered.*