**Zachary J. WAGES, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 02–CF–142, 05–CO–323.**

District of Columbia Court of Appeals.

Argued Oct. 11, 2006.

Decided July 17, 2008.

James T. Wilson, with whom Mary C. Kennedy was on the brief, Washington, for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Elizabeth Trosman, Barbara E. Kittay and James S. Sweeney, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and KRAMER and THOMPSON, Associate Judges.

KRAMER, Associate Judge:

Appellant Zachary Wages was indicted on thirteen charges and at the conclusion of a jury trial was convicted of all.[1] He was sentenced to an aggregate term of 60 years to life imprisonment, and thereafter filed a timely notice of appeal (02–CF–142). While that appeal was pending, appellant filed a motion for a new trial pursuant to D.C.Code § 23–110 (2001), claiming ineffective assistance of counsel. The appeal of his convictions was stayed while hearings on the § 23–110 motion were conducted. Ultimately, the § 23–110 motion was denied and appellant also appeals from that denial (05–CO–323).

Appellant claims that the government failed to present sufficient evidence to sustain his conviction for Malicious Disfigurement While Armed, and that his two convictions for Possession of a Firearm During a Crime of Violence (PFCV) should merge. Appellant also challenges the denial of his motion for a new trial, alleging that his defense counsel was rendered ineffective by a conflict of interest, in violation of the Sixth Amendment.[2] We find the appellant's arguments to be without merit and affirm his convictions.

## I.

### A. The Government's Evidence

The government's theory of the case was that appellant, a self-styled freelance jewelry merchant and regular presence at the National Jewelry Center ('NJC') on Wisconsin Avenue and O Street, Northwest,

---

1. Those charges were Armed Robbery, two counts of Assault with Intent to Kill While Armed, Mayhem While Armed, Malicious Disfigurement While Armed, two counts of Aggravated Assault While Armed, Assault with Intent to Commit Robbery While Armed, two counts of Possession of a Firearm During a Crime of Violence, Carrying a Pistol Without a License (prior felony conviction), Possession of an Unregistered Firearm and Unlawful Possession of Ammunition.

2. While appellant also claimed in that motion that pursuant to Super. Ct.Crim. R. 33, he had newly-discovered evidence which would justify a new trial, he has not appealed the trial court's denial of his post-trial motion based on that ground.

decided to rob the Hajar brothers after familiarizing himself with their routine. To that end, he stalked the brothers at the NJC on the day of these events, waiting outside the building in a white Jeep, then followed the brothers to a restaurant, in the same vehicle, and, with a getaway driver waiting for him behind the wheel, shot the brothers, robbed Ahmed Hajar, and absconded in the Jeep. The evidence adduced at trial overwhelmingly supports this theory.

The evidence at trial was that during the time period relevant to the instant offense, the victims, Mohamed Hajar and his younger brother Ahmed Hajar (hereafter for simplicity's sake referred to as Mohamed and Ahmed) lived in New York City and worked as jewelry salesmen. Pursuant to this employment, both men regularly traveled to retail jewelers to display samples of their products and take orders. Their regular habit was to travel together on Wednesdays from New York to Baltimore and then to the District of Columbia, where they met with customers at the NJC. The NJC is open to the public and provides space for independent dealers to set up booths. The activities and wares of the merchants are readily observable by anyone on the premises. After completing their business at the NJC, the Hajar brothers would continue their Wednesday routine with lunch at the Moby Dick House of Kabob on 31st Street in Georgetown (Moby Dick's), where they were known as regular customers.

On the day of the events at issue, the Hajar brothers engaged in their usual rounds, arriving at the NJC at approximately 1:30 p.m. and leaving some two hours later. Each carried a sample case that contained over $100,000 worth of diamond and gold jewelry. Upon leaving the NJC, the men put their sample cases in the trunk of their car and drove directly to Moby Dick's, arriving at approximately 4:00 p.m. As was their practice, they brought their sample cases inside the restaurant with them.

Initially, the brothers took a table near the restaurant's glass front door. Ahmed, however, became nervous when he noticed a man repeatedly peering through the door at them. He and Mohamed therefore moved to a table behind the door where they could not readily be observed from the street. Ahmed sat facing the door; Mohamed was seated with his back toward the entrance. The only others present in the restaurant's small, well-lit dining room at that time were a cashier named Hassan Tafaghodrad and a customer named Nora Falcon, who was waiting at the counter for a takeout order.

Shortly after 4:00 p.m., the man who had been peering in the door came inside and inquired about prices at the counter. Both Mr. Tafaghodrad and Ms. Falcon referred him to a menu board. The man ignored the menu, however, and approached the Hajar brothers. Mohamed, noticing a look of concern on his brother's face, stood up and turned around. At that moment, the man pulled a stocking down over his face, produced a revolver from the waistband of his pants, and, without uttering a word, shot Mohamed in the side. The bullet traveled straight through Mohamed and struck a wall. Ahmed stood up to help his brother, and the man shot him in the side, and then shot again but missed and hit the wall. Thereafter, Ahmed began grappling with the man for the gun. Pointing the gun above Ahmed's right eye and angling the muzzle downward, the man then shot Ahmed point blank in the face. The bullet struck Ahmed just above his right eyebrow, traveled behind his right eye, ruptured the rear of the eyeball, continued down Ahmed's throat, and exited a few inches below his left earlobe. Ahmed fell

to the floor, and the man grabbed Ahmed's sample bag and fled. As the man ran from the restaurant, Mohamed hit him with a chair. Still clutching the sample bag, the man ran toward a white Jeep Cherokee waiting nearby and entered the vehicle through the passenger side. The vehicle then sped away, as Mohamed, now bleeding heavily, stood outside the restaurant with his cellular phone and yelled for assistance.

Ambulances took the Hajar brothers to George Washington University Hospital Center. Mohamed's lungs had collapsed from the volume of blood in his chest. Surgeons were able to repair the damage, and he was discharged from the hospital one week later. Ahmed's ruptured eye, however, had to be removed. He now wears a prosthetic eye and is completely and permanently blind on the right side. He also lost 25% of the hearing in his left ear and has difficulty breathing because of the injuries he suffered.

Both Hajar brothers testified, and their accounts of their Wednesday routine and the events surrounding the robbery closely coincided. Hassan Tafaghodrad substantiated their accounts up until the moment when the robber fired the first shot. At that point, Mr. Tafaghodrad dropped to the floor behind the counter and did not emerge until after the robber had fled. He estimated that about ten shots were fired. Nora Falcon's account closely matched that of the other eyewitnesses in the dining area, although her narration of the actual shooting differed in sequence from those given by the Hajar brothers. According to Ms. Falcon, first Ahmed was shot in the eye; next the robber reached for the bag; then Mohamed and the robber began to struggle over the bag. At that point, the robber shot Mohamed in the stomach and fled the store.

A bartender and a customer who were present at a restaurant across the street from Moby Dick's at the time of the shooting each testified that he saw a man leave Moby Dick's while carrying something and then enter the passenger side of a white Jeep. Both also said that this man was followed out of the restaurant by another man who was bleeding heavily and yelling into a cell phone. The bartender was "pretty sure" the defendant in the courtroom was the man he saw leave Moby Dick's and enter the Jeep.

Tasha Ford, an account executive, testified that on the day of the robbery, she was calling on customers in the neighborhood where the NJC is located when a man in a white Jeep got out of his vehicle, told her to smile for the camera and then took a picture of her. Ms. Ford testified that she was "very sure" the defendant in the courtroom was the same person who had taken pictures of her. Ms. Ford also stated that the photographer's white Jeep had been sitting in an illegal parking space in the vicinity of the Jewelry Center from at least 2:30 to 3:30 on the afternoon of the events at issue. Ms. Ford was shown photographs by the prosecution and identified them as those appellant had taken of her. One had also been taken from inside the photographer's vehicle and had captured the back portion of the vehicle in the rearview mirror. Ms. Ford identified the vehicle in the picture as the white Jeep she had seen the appellant entering and exiting several times during that afternoon.

Mai Ly Tran Lam testified that she is a jewelry merchant at the NJC and had conducted business with both the Hajar brothers and with the appellant. She said that on the day of the robbery, both appellant and the Hajar brothers had been at the NJC.

Ada Jones, the mother of appellant's girlfriend, Carla Wilson, testified that ap-

pellant drove both a brown Buick Riviera and a white Jeep with paper tags. Ms. Jones said she had seen the appellant operate the Jeep on several occasions in the months before the events at issue. She also testified that the last time she ever saw the white Jeep was the day after the robbery, when it was being driven by appellant's son.

Detective Lawrence Kennedy, who was the lead investigator, testified that five days after the robbery, when tips and eyewitness descriptions and identifications had developed appellant as a suspect, a search warrant was executed at the Northeast residence appellant shared with his girlfriend, Carla Wilson. The search recovered temporary paper tags from the District of Columbia, Maryland, and Virginia, all of which pertained to a Jeep with the same vehicle identification number (VIN), as well as insurance certificates for the Jeep. Investigators also impounded a brown Buick Riviera that appellant was known to drive. A search of this vehicle revealed additional insurance documents and another temporary tag, all of which related to a Jeep with the same VIN as that found on the tags and paperwork recovered from appellant's residence. Rolls of film were also recovered from the Buick that, when developed, showed pictures of Tasha Ford taken in Georgetown.

Detective Kennedy further testified that about a week after the robbery, he attempted to interview appellant's sister, Sandra Wages, whom he had learned was hospitalized at the George Washington University Hospital Center Burn Unit. At the hospital, however, Detective Kennedy observed that Ms. Wages was sedated, intubated and bandaged, and was in no condition to answer questions. Treatment providers at the hospital told Detective Kennedy that Ms. Wages had been severely burned, and that she had reported that she was injured as she tried to light the pilot light on her stove, which then exploded. A check at Ms. Wages's apartment, however, revealed that her stove was intact, and her kitchen had no fire damage.

Based on this information, investigators contacted local fire companies to determine if any of them had responded to a vehicle fire in a white Jeep. This inquiry revealed that the District's Fire and Emergency Medical Service had responded to a vehicle fire in a white Jeep in the 3100 block of Bruce Place, Southeast. A fire investigator who examined the Jeep testified that the fire had been intentionally set by pouring an accelerant into the vehicle's interior, which was then ignited with an open flame. The vehicle identification number of the burnt Jeep matched the number found on the tags and insurance documents in appellant's residence and in the Buick that he drove.

In addition to this evidence, shortly after the robbery Mr. Tafaghodrad, Ms. Falcon, and Mohamed selected appellant's photograph from a nine-person photo array. Mr. Tafaghodrad was 100% certain that appellant was the robber, Ms. Falcon was 98% certain, and Mohamed was 75% certain. All made in-court identifications in addition.

### B. The Defense Evidence

The defense's theory was that the government's case was simply too attenuated and circumstantial to prove appellant's guilt beyond a reasonable doubt. Appellant called several alibi witnesses who testified that they had seen appellant on or around the date and/or time of the offense driving a gold vehicle and wearing a t-shirt with a cartoon character on it.

Two defense witnesses had seen a man carrying something run out of Moby Dick's on the day of the robbery, followed by a man who was wounded and bleeding. One

of the witnesses had been shown a photo array by police and had picked out someone other than the appellant. Both said the defendant in court was not the man they had seen emerge from Moby Dick's. Defense counsel also argued during his closing statements that no physical evidence linked appellant to the crime.

### C. Appointment of Defense Counsel

During pre-trial proceedings, Judge Michael Rankin, to whom the case was originally assigned, proposed to appoint attorney Thomas Heslep as appellant's counsel. Mr. Heslep and the prosecutor immediately informed the judge that Mr. Heslep had a potential conflict of interest in that Mr. Heslep was also representing one Stanley Henderson. Henderson was then awaiting sentencing after pleading guilty to burglary. During an earlier debriefing with the government, arranged by Mr. Heslep, Henderson had provided information about appellant's whereabouts in the weeks before the appellant's arrest and repeated rumors he had heard on the street about the identity of the robbery's getaway driver and the presence in the getaway vehicle of a young child. The information Henderson provided, according to the government, had been duplicative and unhelpful.

After the judge had been informed of the potential conflict, the following colloquy occurred at the bench:

> THE COURT: But on the other hand [Henderson's] not going to be a witness?
>
> [PROSECUTOR]: That's correct, that's right.
>
> MR. HESLEP: That's right. I would think that if I made it clear to [appellant] that I could not tell him about certain thing[s] that occurred and he wanted to go ahead then that would be one thing. Then there's also Mr. Henderson, I have to make clear to him

that this had arisen after his material was given. . . . I mean I would intend to speak at his sentencing about—his attempt to cooperate in terms of trying to show the Court that he was attempting to be helpful but that's about the extent of what it would be.

> THE COURT: It would be a very brief speech.
>
> MR. HESLEP: Right.
>
> THE COURT: Well, I suggest that you go about that, put this over to Monday or Tuesday to give you a chance because I think that you're well-qualified in a number of ways to represent this man, it's going to take a real good lawyer to represent this man. . . . So, I suggest you take a couple of days, come back here one day next week and find out where we are.

The judge then addressed appellant: "I want you and [Mr. Heslep] to have an opportunity to speak to each other, and he has some things that he wants to talk to you about so [I'll] see you on Monday."

When the hearing resumed, the prosecutor again expressed her concern about the "issue with respect to counsel." In a bench conference, Mr. Heslep told the judge that "[he] wasn't particularly worried about [appellant's] half of the equation because as [he] thought it through [he] didn't see any particular disadvantage to [appellant] by what had happened before [appellant] was even arrested." He went on to explain that Henderson was willing to agree to the dual representation as long as appellant was not given his name and the debriefing could still be mentioned at sentencing. The prosecutor continued to express doubt, but her concerns were mainly that Henderson might some day "decide that Mr. Heslep didn't fight hard enough to get him that benefit because he now represents the other individual who stood in jeopardy of that cooperation."

The judge, however, stated that whether or not the cooperation merited any recommendation for leniency was "the Government's call," and that a hearing could be conducted for Henderson's benefit if necessary. The judge then acknowledged, "I'm sort of fighting this, because I really do want Tom [Heslep] to do [appellant's] case." The prosecutor then suggested that Henderson and appellant be given the chance to consult with third-party counsel about the waiver "rather than to turn around later and say I was advised by the very attorney who had the conflict in the first place ..."

Shifting the focus back to appellant, the prosecutor stated that she "would like to protect this record ... because this a very, very serious offense." The judge responded, "See [appellant] is an easy case. It's [Henderson] that apparently is some concern, is a big concern." Again, the prosecutor interjected that she was concerned appellant would "come back later with a new lawyer," and again the judge opined, "I think this guy, I think he's good. I think we can go forward on his case this morning. And I wouldn't worry ..."

The judge then called appellant to the bench and told appellant that he concluded that Mr. Heslep's continuing representation of Henderson and appellant would not be a conflict of interest. Although the judge found no conflict, he gave appellant the final say in whether or not to continue being represented by Mr. Heslep. Appellant indicated that he understood the situation and that he wanted to continue being represented by Mr. Heslep.

Mr. Heslep proceeded to represent appellant throughout the trial. On the first day of trial, Judge Henry Greene, who presided over the trial and post-trial matters, asked appellant, "up until this point in the proceedings to this day and time, are you satisfied with the help and assistance you have received from your lawyers?" Appellant answered, "From my attorney, yes." Following his convictions, however, appellant, acting *pro se*, sent Judge Greene a letter listing a series of grievances with the manner in which the proceedings had been conducted, including an allegation of ineffective assistance of counsel. Judge Greene forwarded the letter to Mr. Heslep who filed a motion to withdraw. Judge Greene granted the motion and appointed new counsel.

## II.

### A. The Alleged Conflict of Interest

■ Appellant now contends that the trial court erred in denying his motion for a new trial based upon D.C.Code § 23–110 (2001) and Super. Ct.Crim. R. 33 on the grounds that his defense counsel had an actual conflict of interest, *i.e.*, one that adversely affected his counsel's performance. As a result, appellant submits, he was denied the assistance of counsel guaranteed by the Sixth Amendment and a new trial is required. Specifically, appellant argues that he was prejudiced by the failure of his counsel to inform him of Henderson's identity and to inquire sufficiently into the information Henderson provided. Because of the existence of this conflict, appellant contends, on the day of the preliminary hearing Judge Rankin was required to either replace Mr. Heslep or obtain a waiver of conflict-free counsel from appellant. Since Judge Rankin did neither, appellant concludes, his conviction must be reversed. The government responds that appellant has not established an actual conflict of interest, and that even if he had done so, appellant has not made the required showing that the conflict had

any adverse effect.[3]

Conceding that the "substance of what Mr. Heslep did not use or failed to learn may never be known," appellant nonetheless asserts that an attorney who did not represent Henderson would have been more "fearlessly ... willing to explore all plausible measures in handling the information from Mr. Henderson." As appellate counsel explained at oral argument, from the very beginning, Mr. Heslep told appellant that he had gained certain information from another client that he could not share. This undoubtably had an effect on the representation, counsel stated, and that effect could only be bad.

■ "The trial court's determination of whether a conflict of interest exists 'presents a mixed question of law and fact.'" *Veney v. United States,* 738 A.2d 1185, 1193 (D.C.1999) (quoting *Derrington v. United States,* 681 A.2d 1125, 1132 (D.C. 1996)). This court's review of that determination is deferential: it accepts the trial court's findings of fact unless they lack evidentiary support and reviews the legal issues *de novo. Id.* Applying that deferential standard of review, we now analyze appellant's claims.

■ To comply with the Sixth Amendment's guarantee of the right to counsel in a criminal case, that assistance must be "effective," *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ordinarily, to obtain reversal of a conviction on the grounds of ineffective assistance of counsel, a criminal defendant must show deficient performance on the part of his counsel and prejudice. *Id.* at 687, 104 S.Ct. 2052; *Derrington, supra,* 681 A.2d at 1133.

■ A criminal defendant, however, can also establish ineffective assistance of counsel by showing that defense counsel had an actual conflict of interest. *Derrington, supra,* 681 A.2d at 1133. No showing of prejudice is necessary under those circumstances. Rather, it is automatic when objection was made to the representation and the trial court nevertheless ordered it to proceed. *Holloway v. Arkansas,* 435 U.S. 475, 489, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (citing *Glasser v. United States,* 315 U.S. 60, 75–76, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). "An actual conflict of interest exists when a defense attorney is required to make choices advancing [one client's] interest to the detriment of [another's]." *Veney, supra,* 738 A.2d at 1192 (D.C.1999) (internal quotations and citations omitted). Since appellant can prove no actual conflict, he cannot prevail.

■ Here, appellant has demonstrated at most a potential conflict of interest, a showing which "is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Henderson's sentencing was scheduled to occur before appellant's trial. The more information Henderson provided to the government tended to incriminate appellant and facilitate his prosecution, the stronger Henderson's argument for leniency would have been. Yet, as noted at the preliminary hearing, the government had determined, even before appellant was arrested and represented by the allegedly conflicted attorney, that Henderson's information

---

**3.** In his reply brief, appellant goes further and argues that the prosecutor, in suggesting at the preliminary hearing that appellant discuss the issue of *attorney conflict with outside counsel, effectively conceded the existence of the conflict. We are unwilling to accept that the mere suggestion that the assistance of outside counsel to help resolve a potential conflict in itself establishes a conflict. Such a ruling could chill this salutary approach, which can assist in cutting through issues of possible attorney conflict.

was "unhelpful" and duplicative and could not form the basis of a cooperation agreement. Moreover, as Judge Rankin noted, that characterization was "the Government's call." The "unhelpful" and "duplicative" nature of Henderson's information was precisely why he was never called as a witness.

Since Henderson's statements added nothing to what the government already knew, and since they were made before appellant's arrest and the appointment of Mr. Heslep as his attorney, Henderson's attempted cooperation did not force Mr. Heslep to choose between the interests of these two clients. With regard to Henderson's upcoming sentencing, Mr. Heslep explained to Judge Rankin that he was simply going to make the point that Henderson had "attempt[ed]" to help the government. This would not have required Mr. Heslep to argue that any information Henderson provided was actually helpful. Thus, while the potential for conflict did exist, the government's prior determination that Henderson was neither a useful informant nor witness prevented the potential conflict from developing into an actual conflict.

Appellant asserts that Mr. Heslep, at the preliminary hearing, acknowledged the conflict and explained how it would affect appellant. This overstates what Mr. Heslep represented to the court. Both Mr. Heslep and the prosecutor recognized the *potential* for conflict and conscientiously informed the court of that potential. The court then made the requisite inquiry to determine if an actual conflict existed. What concern there was focused mainly on the effect the simultaneous representation would have on *Henderson*. The result of the inquiry was that the court, Mr. Heslep and appellant himself all agreed that no such conflict precluded Mr. Heslep's representation of appellant.

■ Notably, the colloquy that occurred at the preliminary hearing was not a waiver of an actual conflict. It was simply an inquiry to determine whether such a conflict existed in the first place. Since Judge Rankin found it did not, the more elaborate waiver required for an actual conflict of interest never became necessary. Instead, Judge Rankin said: "Well, I think that we have explored to the extent possible the conflict, the potential conflict, and *it does not appear that there is any conflict for him representing you* .... I think that today it is pretty clear that he can represent you *without conflict*." (emphasis supplied). This court, as noted above, is required to treat the trial court's finding with deference, *Veney, supra*, 738 A.2d at 1193, We see nothing in the record that would undermine this finding.[4]

**B. Sufficiency of the Evidence Regarding the Specific Intent Element of Malicious Disfigurement While Armed**

■ Appellant next claims that the government's evidence was insufficient to establish the specific intent necessary for a conviction of malicious disfigurement while armed.[5] "In assessing a claim of eviden-

4. Even assuming, *arguendo*, that an actual conflict existed and that it was not waived, appellant has not contended that he objected to the representation. Therefore, he must show that the conflict had an adverse affect on his lawyer's performance for it to result in reversal of his convictions. *Cuyler*, 446 U.S. at 348, 100 S.Ct. 1708 (1980). This he cannot do.

5. To convict a defendant of malicious disfigurement under D.C.Code § 22–406 (2001), the government must prove each of the following beyond a reasonable doubt:
 (1) That the defendant inflicted an injury on the complaining witness,
 (2) That, as a result of the injury, the complaining witness was permanently disfigured,

tiary insufficiency, we must view the record 'in the light most favorable to the government, giving full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.'" *Alfaro v. United States*, 859 A.2d 149, 160 (D.C.2004) (quoting *Perry v. United States*, 812 A.2d 924, 930 (D.C.2002)). To prevail, appellant must show that "the government presented 'no evidence' upon which a reasonable mind could find guilt beyond a reasonable doubt." *Mihas v. United States*, 618 A.2d 197, 200 (D.C.1992) (quoting *Robinson v. United States*, 506 A.2d 572, 573 (D.C. 1986)).

Citing *State v. Jenkins*, 307 Md. 501, 515 A.2d 465 (1986), appellant contends that a "clear tension exists in finding both an intent to kill and an intent to disfigure because an intent to disfigure requires a belief that the victim shall survive." [6] Thus, the conviction for malicious disfigurement, appellant argues, must be overturned on the ground that the evidence is insufficient to support it. Specifically, appellant contends that the government presented no evidence that he intended maliciously to disfigure Ahmed before shooting him, but that the government is instead impermissibly using the result of his actions to infer his intent. We disagree and conclude that *Jenkins* supports the government's position rather than appellant's.

In *Jenkins*, the Maryland Court of Appeals wrote:

> While we agree that the intents [i.e., to kill or to disfigure] are inconsistent, we do not agree ... that the *offenses* are inconsistent.... Instead, we believe that there is logic in the State's suggestion that a perpetrator of an assault may harbor both intents at the time of the assault. Although the intents remain inconsistent or mutually exclusive, they can be held disjunctively.
>
> Thus, in committing an assault, the perpetrator might intend that the victim die. At the same time, the perpetrator might have an alternate intent that, if the victim does not die, he at least be maimed or disfigured or disabled. The fact that the intents may be mutually exclusive does not preclude their being held as alternatives by the same person at the same time. The second intent is held as a conditional matter, conditioned upon the first intent not being achieved. The criminal law recognizes the possibility of conditional and qualified intents.

*Id.* at 516, 515 A.2d 465 (citing R. Perkins, Criminal Law, (2d ed.1969) at 575).

Our case of *Peoples v. United States*, 640 A.2d 1047 (D.C.1994), is also helpful in analyzing the issue here. It reflects the broad leeway extended to juries to infer,

(3) That, at the time the defendant inflicted the injury, he specifically intended to disfigure the complaining witness,
(4) That, when he inflicted the injury, the defendant was acting with malice.
To be permanently disfigured means that the person is appreciably less attractive or that a part of his body is to some appreciable degree less useful or functional than it was before the injury.
'Malice' is a state of mind or heart regardless of the life and safety of others. It may also be defined as the condition of mind which prompts a person to do wilfully, that is on purpose without adequate provoca-

tion, justification or excuse, a wrongful act the foreseeable consequence of which is a serious permanent disfiguring bodily injury to another.
*Perkins v. United States*, 446 A.2d 19, 26 (D.C. 1982).

**6.** Appellant also argues that the trial court incorrectly concluded that an intent to kill automatically suffices to establish a specific intent maliciously to disfigure. While it is true that in the course of argument, the trial court expressed that opinion, it was ultimately not the basis for the court's ruling.

from circumstantial evidence, the necessary specific intent for malicious disfigurement. That leeway is well illustrated by *Peoples*. After his girlfriend ended their relationship, Earl Peoples went to her parents' house in the early morning while those inside were still sleeping and deliberately set it on fire. *Id.* at 1055. One person was killed and five others were seriously burned; the survivors suffered varying levels of permanent disfigurement and disability. *Id.* at 1051–1052. Although Peoples had been heard to say that he would blow up the house and everyone in it if his girlfriend ever left him, *Id.* at 1056, he argued at trial that "the jury could not infer the requisite intent from his deliberate act in starting the fire with a flammable liquid." *Id.* at 1055. In sustaining his convictions of five counts of malicious disfigurement while armed, we held that "[i]t is reasonable to infer that appellant knew that the people inside the house would sustain grievous burn injuries *if they escaped alive* .... All of these circumstances evidence appellant's intent sufficiently to permit the jury to find that appellant had the requisite specific intent ..." *Id.* at 1055–56 (emphasis supplied). In so doing, this court also implicitly adopted the reasoning of *Jenkins* that a perpetrator could alternatively harbor the intent to disfigure in the event that he did not achieve his primary intent to kill.

Thus, *Peoples,* like *Jenkins,* concluded that a perpetrator may harbor at the same time, on an alternative basis, an intent to murder and an intent to maim, disfigure, or disable. *Id.* at 1055. We conclude that this reasoning is sound and comports with the realities of human nature that at any given time a person may have both a primary objective and a secondary, fallback objective.

In ruling on appellant's motion for judgment of acquittal on the charge of malicious disfigurement, the trial court pointed out that by its verdict of guilty on the charge of assault with intent to kill, the jury necessarily found that appellant intended to kill Ahmed, and noted that he had aimed precisely in his effort to do so, rather than firing wild shots. But although he had shot Ahmed once, and the bullet had entered Ahmed's body, this had not totally disabled him. It was immediately thereafter when Ahmed, though wounded, grappled with appellant for the gun, which was when appellant—obviously aware that his first plan of killing both brothers had not worked—deliberately pointed the gun above Ahmed's right eye, angled the muzzle downward, and shot Ahmed point blank in the face, destroying his eyeball and causing the permanent disfigurement that forms the basis for the malicious disfigurement charge.

While there was certainly sufficient evidence that appellant intended to kill Ahmed (and indeed it is a miracle that he did not), there was also sufficient evidence, in line with the reasoning of *Jenkins* and *Peoples,* that his alternative position when he shot Ahmed right in the face was to make that part of his body, most particularly his eye, to some appreciable degree less useful or functional than it was before the injury. And there is no question that appellant's alternative goal was met. Thus, we hold that the previous shots, combined with appellant's proximity to the victim, his clear calculation in committing the crime, and the fact that appellant intentionally shot Ahmed in a place on his body that would most certainly make it appreciably less useful or functional than before the injury, was sufficient to uphold the jury's verdict of malicious disfigurement.

### C. Merger of the Possession of a Firearm During a Crime of Violence Counts

Appellant's third argument is that under *Nixon v. United States,* 730 A.2d

145 (D.C.1999), and *West v. United States*, 866 A.2d 74 (D.C.2005), his two convictions for possession of a firearm during a crime of violence (PFCV) must merge because the shootings of the Hajar brothers occurred with the same gun during the same violent episode. We disagree.

As we noted in *Hanna v. United States*, 666 A.2d 845 (D.C.1995), "PFCV ... requires more than mere possession: the defendant must possess the firearm while committing a crime of violence. Each time the defendant commits an independent violent crime, a separate decision is made whether or not to possess the firearm during that crime." *Id.* at 855 n. 12. As a rule, crimes do not merge if they are perpetrated against different victims. *See, e.g., Adams v. United States*, 466 A.2d 439, 443 n. 3 (D.C.1983) (two offenses do not merge where each offense was directed against a different victim).[7] We have found, however, that under certain circumstances, PFCV crimes do merge even when the predicate crimes are perpetrated against different victims. In particular, in *West*, we held that two PFCV counts merged in a shooting with two victims, and in *Nixon*, we held that multiple PFCV counts merged when there was a single shooting incident with multiple victims. But in each of these cases there was a single shooting incident, that is, one assaultive act that resulted in multiple victims.[8] This exception to the general rule does not apply in this case.

In *Reeves v. United States*, this court held that multiple PFCV counts did not merge where the predicate crimes were distinct assaults, each "stem[ming] from a fresh impulse." 902 A.2d 88, 90 (D.C. 2006). Like Wages, Reeves assaulted several patrons in a restaurant, with a weapon, while robbing them. We found that after each assault, Reeves "was able to desist from violence against another victim, but chose not to do so," and so, "his successive intentions made him subject to cumulative punishment." *Id.* (internal quotation and citation omitted). As in *Reeves*, here Wages committed distinct assaults. After shooting Mohamed, he reached a "fork in the road" where he could have chosen not to shoot and rob Ahmed. Instead, with a fresh impulse, he executed a new assault. Therefore, despite the proximity of the crimes in time and place, they constitute distinct violent crimes, and the PFCV convictions do not merge.

For the foregoing reasons, appellant's motion for a new trial pursuant to D.C.Code § 23–110 is denied, and his convictions, including the conviction for malicious disfigurement, are affirmed.

*So ordered.*

---

7. *Compare Joiner v. United States*, 585 A.2d 176, 178 (D.C.1991) (only one offense where assaultive act is directed, collectively, at more than one victim).

8. We have characterized this exception as a "limited exception" to the general rule that when the convictions for the predicate crimes do not merge, the associated PFCV convictions do not merge. *Stevenson v. United States*, 760 A.2d 1034, 1036 (D.C.2000) In *Nixon*, the appellant shot at a car, hitting three of four young men seated in it. In *West*, the appellant, in a matter of seconds, shot two persons standing next to each other at a cookout, one of whom was the intended victim, and the other a hapless bystander.