J-S47017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
:         PENNSYLVANIA
:
v.                        :
:
:
:
WILLIE L. HARRIS             :
:
Appellant          :   No. 3338 EDA 2024

Appeal from the Judgment of Sentence Entered August 9, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005859-2022

BEFORE: PANELLA, P.J.E., OLSON, J., and BECK, J.

MEMORANDUM BY OLSON, J.:            **FILED MARCH 9, 2026**

Appellant, Willie L. Harris, appeals from the judgment of sentence entered on August 9, 2024, as made final by the denial of Appellant's post-sentence motion by operation of law on December 9, 2024. We affirm.

The trial court ably summarized the underlying facts of this case:

> The Commonwealth charged [Appellant] with rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion, indecent assault with forcible compulsion, strangulation, burglary, criminal trespass, robbery threatening immediate serious bodily injury, robbery threatening immediate bodily injury, and robbery by committing or threatening to commit involuntary deviate sexual intercourse.[1] Trial commenced on September 6, 2023.

_____

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3126(a)(2), 2718(a)(1), 3502(a)(3), 3503(a)(1)(i), 3701(a)(1)(i), 3701(a)(1)(ii), 3701(a)(1)(iii), respectively.

. . .

The Commonwealth called the victim as its first witness. The victim explained her roles and responsibilities as the legal secretary for the Tinari Law Firm located at 1313 Race Street, in Center City, Philadelphia, adjacent to the Juanita Kidd Stout Center for Criminal Justice. On July 5, 2022, the day before the victim's 23rd birthday, she was working alone in an interior office in the early afternoon when she noticed "out of the corner of [her] eye, [an unfamiliar man] leaning over the receptionist counter." The victim greeted him in the reception area, assuming he was a client or needed help finding where to go. [Appellant] said he was "looking for someone named Samantha." When the victim explained no one worked there by that name, he "pushed [past her] and started walking into Mr. Tinari's office." [Appellant] was "very agitated" and looked for money in the office. The victim went into survival mode and offered [Appellant] her earrings, AirPods, a coworker's purse, and her backpack. [Appellant] refused and instead made the victim put her phone down and locked the front door of the office.

[Appellant] then hit the victim across her face with both an open hand and closed fist. She pleaded with him to stop and told him people would return at any minute. When she screamed for help, [Appellant] told he would kill her if she called out again. [Appellant] then strangled her several times to the point where her vision blurred.

[Appellant] threatened to kill her and forced her to perform oral sex on him, holding her wrists down while he pulled his pants down. He then forced his penis into her mouth. [Appellant] then changed course because "he didn't like it." He took off the victim's pants. The victim felt "humiliated" and continued to beg him to stop. [Appellant] threw her to the floor and forced his penis into her vagina. The victim's co-worker returned to the office from her lunch break at that point, which spooked [Appellant] and prompted him to leave.

The victim, still on the floor and trying to get her pants back on, begged her coworker to call 911 because she "just got raped." After the police arrived, the victim was taken to Thomas Jefferson Hospital, where she was given penicillin and evaluated for about six hours. She spoke with two

detectives and signed a statement. The victim never consented to oral or vaginal sex. She tried to return to work but never again felt comfortable going to that law firm.

Kaisa Codner, an intern at the Tinari firm, testified she left the office on July 5, 2022, for about 20 minutes to get lunch in the early afternoon. When she returned, the door was unexpectedly locked. She unlocked the door and took her lunch to the conference room and at that point heard the door from Mr. Tinari's office open. She saw a man leave the office and recognized him. She had seen him lingering outside the building when she left for lunch. She then found the victim on the floor crying hysterically. The victim's clothes were mostly off, her hair was messy, and she looked scared. The victim told her that she had been raped and begged Ms. Codner to lock the door and call 911.

The Commonwealth played the 911 call for the jury. The defense did not object.

James Owen, a registered sexual assault nurse examiner, testified he examined the victim on July 5, 2022, at 9:31 p.m. at the Sexual Assault Response Center, and took rape kit specimens.

Jean Hess, a Forensic Scientist 3 with the Philadelphia Police Department Office of Forensic Sciences, analyzed the DNA samples collected from the investigation, including: the interior and exterior crotch area of [Appellant's] pants, the interior and exterior crotch area of the victim's underwear, the TD Bank bag recovered from the Tinari Office, and the desk from the Tinari Office. Hess also examined DNA samples from the victim's rape kit. Hess was able to conclude to a reasonable degree of medical certainty that the DNA found on the interior and exterior crotch area of [Appellant's] pants matched the victim's DNA. It was "119.8 quadrillion times more likely" that the DNA on [Appellant's] clothes came from the victim as opposed to another random unrelated individual in the Caucasian population.

Detective Enz offered into evidence photos he had taken of the victim's neck that showed red scratch marks.

Detective Modres testified he sent a patrol alert to law enforcement in Philadelphia and New Jersey. Police in Woodbury, New Jersey, responded with a photograph of a man they believed matched the description. [Appellant] was arrested by the Washington Township Police Department on July 7, 2022, in New Jersey.

Detective Poulous introduced surveillance video that showed [Appellant] entering the Tinari Law Firm's office building on July 5, 2022. [Appellant] did not testify.

The jury returned guilty verdicts on September 12, 2023, on all counts except for count one – rape with forcible compulsion.

On August 9, 2024, the Commonwealth and [Appellant's] counsel presented experts on whether the sentencing court should designate [Appellant] a Sexually Violent Predator ("SVP").

The Commonwealth called Dr. John Siegler. Dr. Siegler was appointed to the Sexual Offenders Assessment Board ("SOAB") by the Governor in 2018. He testified he receives information enumerated by the sex offender registration statute to help him assess defendants. SOAB examiners assess from this information whether a person who has been convicted of a sexually violent offense is likely to engage in future predatory sexually violent offenses due to a mental abnormality or personality disorder.

Dr. Siegler considered 14 statutory factors:

> The number of victims, whether the subject exceeded the means necessary to achieve the offense, the nature of the contact with the victim, relationship of the individual to the victim, whether they were acquainted or not, the age of the victim, whether there was unusual cruelty during the commission of the offense, the mental capacity of the victim, the prior offense history, whether the individual completed any prior sentences, whether the individual participated in available programs for sexual offenders, the age of the individual, mental illness or disability, and the behavioral characteristics that contribute to the individual's conduct.

Dr. Siegler determined [Appellant] met both prongs of the SVP designation (mental abnormality and propensity). Dr. Siegler considered [Appellant's] prior offense history. [Appellant] was 19 years old when his criminal record began and accrued more than 30 convictions over the ensuing 30 years. This criminal activity "constituted antisocial behavior over that period of time" and is "indicative of deeply ingrained and rigid dysfunctional thought process, a mental abnormality, that is the impetus for his [current] offending behavior." Dr. Siegler believed [Appellant] "demonstrate[d] a limited capacity for relationships," and a "lack of concern for others based on his repeated offending behavior, impulsivity, and poor problem solving." Dr. Siegler then considered the relationship between [Appellant] and the victim. He concluded [Appellant] initiated contact with the victim "in order to exploit her for his sexual gratification." Dr. Siegler concluded his SVP determination of [Appellant] was made to a reasonable degree of psychological certainty.

The court found that [Appellant] met the definition of a Sexually Violent Predator by clear and convincing evidence.

[Appellant] then addressed the court. He apologized to the victim's family and expressed his years' long battle with drugs and addiction. He asked for mercy.

The court [sentenced Appellant to serve an aggregate term of 15 to 30 years in prison, followed by five years of probation, for his crimes].

Trial Court Opinion, 5/12/25, at 1-8 (citations and some capitalization omitted).

Following the denial of Appellant's post-sentence motion by operation of law, Appellant filed a timely notice of appeal. Appellant raises ten issues on appeal:

[1.] Prior to trial, did the court improperly deny [Appellant's] request for trial counsel to be removed due to irreconcilable differences and new counsel be appointed, and [Appellant]

was forced to proceed to trial where he was found guilty of IDSI, burglary, robbery and related charges?

[2.] Did the court improperly make a finding that [Appellant] was a "sexually violent predator" where the record does not reflect that the standard of clear and convincing evidence was met where the court heard testimony of two experts with differing opinions on whether [Appellant] met the criteria required to be found a "sexually violent predator?"

[3.] Did the court err when it imposed an aggregate sentence of 15-30 years incarceration because the sentence was excessive, more than necessary to protect the public, punish the defendant and rehabilitate [Appellant]?

[4.] Did the court impermissibly factor at [Appellant's] sentencing, the [Appellant's] prior arrests that did not result in convictions, as well as including his status as a "sexually violent predator?"

[5.] Did the court err when it sentenced [Appellant] to aggravated sentences that ran consecutively due to the inflaming nature of the media coverage for this matter; the improper "victim impact" testimony under 42 Pa.C.S. § 9738 submitted by the Commonwealth before defense counsel could object; allowed testimony given by the victim's employer; and the Commonwealth's testimony that something may have happened during his juvenile years, but was lacking a scintilla of evidence. In addition, [the trial] court failed to fully weigh the considerable remorse [Appellant] showed during his allocution; his decades long battle with addiction; the system's inability to focus on his rehabilitative needs during his previous contacts; his abuse as a child; the mental health challenges he suffered through his life; lastly, but vitally, his significant attempts to make things right through the extraordinary mitigating factor?

[6.] Did the court err where the verdicts for all of the charges at trial were against the weight of the evidence and the court failed to award a new trial?

[7.] Did the court err when it improperly allowed the 911 audio tapes to be played in front of the jury and admitted as evidence because they we inadmissible as hearsay?

[8.] Did the court err where it failed to set aside the verdict where the verdicts for all of the charges were insufficient?

[9.] Did the court err where it failed to grant the motion for mistrial either during trial or after trial?

[10.] Did the court err when it removed juror number seven and seated juror thirteen in their place after deliberations had begun?

Appellant's Brief at 5-7.

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinion of the able trial court judge, the Honorable Christopher R. Hall. We conclude that Appellant is not entitled to relief in this case, for the reasons expressed in Judge Hall's well-reasoned May 12, 2025 opinion. Therefore, we affirm on the basis of Judge Hall's able opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Hall's May 12, 2025 opinion.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/9/2026

Filed

MAY 1 2 2025

Office of Judicial Records
Appeals Unit

**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | 3338 EDA 2024 |
| | : | |
| V. | : | CP-51-CR-0005859-2022 |
| | : | |
| WILLIE L. HARRIS | : | |

## 1925(a) OPINION IN SUPPORT OF ORDER

Christopher R. Hall, J.

## I. Introduction

Defendant Willie Harris ("Harris") complains on appeal of ten errors in his conviction for deviate sexual intercourse and related crimes of violence committed against a 22-year-old legal secretary in a commercial office adjacent to the courthouse in Center City, Philadelphia, while the secretary worked alone during her lunch hour. The appeal is without merit. Harris' conviction and sentence should be affirmed.

## II. Procedural History

The Commonwealth charged Harris with rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion, indecent assault with forcible compulsion, strangulation, burglary, criminal trespass, robbery threatening immediate serious bodily injury, robbery threatening immediate bodily injury, and robbery by committing or threatening to commit involuntary deviate sexual intercourse. Trial commenced on September 6, 2023. The jury returned guilty verdicts on September 12, 2023, on all counts except count one (rape by forcible compulsion). Tr. 9/12/2023 at 20-22. The court sentenced Harris to 15 to 30 years followed by 5 years' probation supervised by the State Sex Offender Unit.

## III. Matters Complained of On Appeal

Harris complains of ten errors, suggesting by the long list that none have merit. He asserts the trial court (1) improperly denied his request during *voir dire* for new trial counsel; (2) improperly found Harris was a "sexually violent predator" at sentencing; (3) erroneously imposed a sentence of 15-30 years imprisonment; (4) impermissibly factored Harris' prior arrests when imposing sentence; (5) impermissibly considered media reports and victim impact testimony and failed to consider Harris' history with addiction when imposing the sentence; (6) erroneously denied a motion for new trial based on the weight of the evidence; (7) improperly permitted the introduction into evidence of a 911 call; (8) erroneously denied a motion for new trial based on insufficiency of evidence; (9) erroneously denied a motion for mistrial; and (10) erroneously replaced a juror with an alternate after deliberations began.

## IV. Harris' Request for New Counsel During Jury Selection

On September 5, 2023, Harris moved for appointment of new counsel before jury selection began. Tr. 9/05/2023 at 3-5. Harris sought to remove his counsel, Mr. Julian Settles, because Mr. Settles had told him the jury would likely convict based on the overwhelming evidence (a DNA match and video surveillance). *Id.* at 6-7. Harris expressed to the court that he distrusted Mr. Settles because of this candid advice. *Id.* at 5-6. Mr. Settles responded that, "whether a defendant or client is guilty, or innocent does not change [his] professionalism or approach to the case" and reiterated his ability to provide competent representation at trial. *Id.* at 6. Harris protested that Mr. Settles did not care about him. *Id.* at 7. Mr. Settles stated, "I do." *Id.*

After a brief recess, the Court reviewed the standard for appointing new counsel and denied the motion. The court explained that – while the conversation between Mr.

Settles and Harris may have been "difficult" – Mr. Settles had demonstrated competence. *Id.* at 11. The court had no doubt Mr. Settles would honor Harris' desire to go to trial and represent him zealously. *Id.*

## V. Evidence at Trial

Trial commenced on September 6, 2023. The Commonwealth called the victim as its first witness. Tr. 9/6/2023 at 33. The victim explained her roles and responsibilities as the legal secretary for the Tinari Law Firm located at 1313 Race Street, in Center City, Philadelphia, adjacent to the Juanita Kidd Stout Center for Criminal Justice. *Id.* at 35-36. On July 5, 2022, the day before the victim's 23rd birthday, she was working alone in an interior office in the early afternoon when she noticed "out of the corner of [her] eye, [an unfamiliar man] leaning over the receptionist counter." *Id.* at 44. The victim greeted him in the reception area, assuming he was a client or needed help finding where to go. *Id.* at 48. Harris said he was "looking for someone named Samantha." *Id.* at 49. When the victim explained no one worked there by that name, he "pushed passed [her] and started walking into Mr. Tinari's office." *Id.* Harris was "very agitated" and looked for money in the office. *Id.* The victim went into survival mode and offered Harris her earrings, AirPods, a coworker's purse, and her backpack. *Id.* at 50, 52. Harris refused and instead made the victim put her phone down and locked the front door of the office. *Id.*

Harris then hit the victim across her face with both an open hand and closed fist. *Id.* at 52. She pleaded with him to stop and told him people would return at any minute. *Id.* at 53. When she screamed for help, Harris told he would kill her if she called out again. Harris then strangled her several times to the point where her vision blurred. *Id.* at 53, 54.

Harris threatened to kill her and forced her to perform oral sex on him, holding her wrists down while he pulled his pants down. *Id.* at 55. He then forced his penis into her mouth. *Id.* at 56. Harris then changed course because "he didn't like it." He took off the victim's pants. *Id.* at 57-58. The victim felt "humiliated" and continued to beg him to stop. *Id.* at 59. Harris threw her to the floor and forced his penis into her vagina. *Id.* The victim's co-worker returned to the office from her lunch break at that point, which spooked Harris and prompted him to leave. *Id.* at 60-62.

The victim, still on the floor and trying to get her pants back on, begged her coworker to call 911 because she "just got raped." *Id.* at 63. After the police arrived, the victim was taken to Thomas Jefferson Hospital, where she was given penicillin and evaluated for about six hours. *Id.* at 67. She spoke with two detectives and signed a statement. *Id.* at 68. The victim never consented to oral or vaginal sex. She tried to return to work but never again felt comfortable going to that law firm. *Id.* at 71, 72.

Kaisa Codner, an intern at the Tinari firm, testified she left the office on July 5, 2022, for about 20 minutes to get lunch in the early afternoon. *Id.* at 95-96, 101. When she returned, the door was unexpectedly locked. *Id.* at 102. She unlocked the door and took her lunch to the conference room and at that point heard the door from Mr. Tinari's office open. *Id.* at 103. She saw a man leave the office and recognized him. She had seen him lingering outside the building when she left for lunch. *Id.* at 103, 104. She then found the victim on the floor crying hysterically. *Id.* at 103. The victim's clothes were mostly off, her hair was messy, and she looked scared. *Id.* at 104. The victim told her that she had been raped and begged Ms. Codner to lock the door and call 911. *Id.* At 105.

4

The Commonwealth played the 911 call for the jury. *Id.* at 108. The defense did not object.

James Owen, a registered sexual assault nurse examiner, testified he examined the victim on July 5, 2022, at 9:31 PM at the Sexual Assault Response Center, and took rape kit specimens. *Id.* at 147-149, 155-56.

Jean Hess, a Forensic Scientist 3 with the Philadelphia Police Department Office of Forensic Sciences, analyzed the DNA samples collected from the investigation, including: the interior and exterior crotch area of Harris' pants, the interior and exterior crotch area of the victim's underwear, the TD Bank bag recovered from the Tinari Office, and the desk from the Tinari Office. Tr. 9/7/2023 at 55, 59, 60, 67, 68. Hess also examined DNA samples from the victim's rape kit. *Id.* at 61-62. Hess was able to conclude to a reasonable degree of medical certainty that the DNA found on the interior and exterior crotch area of Harris' pants matched the victim's DNA. It was "119.8 quadrillion times more likely" that the DNA on Harris' clothes came from the victim as opposed to another random unrelated individual in the Caucasian population. *Id.* at 68.

Detective Enz offered into evidence photos he had taken of the victim's neck that showed red scratch marks. *Id.* at 121.

Detective Modres testified he sent a patrol alert to law enforcement in Philadelphia and New Jersey. *Id.* at 208-209, 211. Police in Woodbury, New Jersey, responded with a photograph of a man they believed matched the description. *Id.* at 210. Harris was arrested by the Washington Township Police Department on July 7, 2022, in New Jersey. *Id.* at 213-214.

5

Detective Poulous introduced surveillance video that showed Harris entering the Tinari Law Firm's office building on July 5, 2022. Tr. 9/7/2023 at 51-52.

Harris did not testify. *Id.* at 88-98.

The jury returned guilty verdicts on September 12, 2023, on all counts except for count one—rape with forcible compulsion. Tr. 9/12/2023 at 20-22.

## VI. Sentencing

On August 9, 2024, the Commonwealth and Defense Counsel presented experts on whether the sentencing court should designate Harris a Sexually Violent Predator ("SVP"). Sentencing Transcript at 5.

The Commonwealth called Dr. John Siegler. Dr. Siegler was appointed to the Sexual Offenders Assessment Board ("SOAB") by the Governor in 2018. *Id.* at 23. He testified he receives information enumerated by the sex offender registration statute to help him assess defendants. *Id.* at 23. SAOB examiners assess from this information whether a person who has been convicted of a sexually violent offense is likely to engage in future predatory sexually violent offenses due to a mental abnormality or personality disorder. *Id.* at 27.

Dr. Siegler considered 14 statutory factors:

> The number of victims, whether the subject exceeded the means necessary to achieve the offense, the nature of the contact with the victim, relationship of the individual to the victim, whether they were acquainted or not, the age of the victim, whether there was unusual cruelty during the commission of the offense, the mental capacity of the victim, the prior offense history, whether the individual completed any prior sentences, whether the individual participated in available programs for sexual offenders, the age of the individual, mental illness or disability, and the behavioral characteristics that contribute to the individual's conduct.

Id. at 28.

6

Dr. Siegler determined Harris met both prongs of the SVP designation (mental abnormality and propensity). Dr. Siegler considered Harris' prior offense history. *Id.* at 31. Harris was 19 years old when his criminal record began and accrued more than 30 convictions over the ensuing 30 years. *Id.* at 31-32. This criminal activity "constituted antisocial behavior over that period of time" and is "indicative of deeply ingrained and rigid dysfunctional thought process, a mental abnormality, that is the impetus for his [current] offending behavior." *Id.* at 33. Dr. Siegler believed Harris "demonstrate[d] a limited capacity for relationships," and a "lack of concern for others based on his repeated offending behavior, impulsivity, and poor problem solving." *Id.* at 35. Dr. Siegler then considered the relationship between Harris and the victim. *Id.* at 38. He concluded Harris initiated contact with the victim "in order to exploit her for his sexual gratification." *Id.* Dr. Siegler concluded his SVP determination of Harris was made to a reasonable degree of psychological certainty. *Id.* at 41; Commonwealth Exh. C-1, "Sexual Violent Predator Assessment-Revised" at 13.

The court found that Harris met the definition of a Sexually Violent Predator by clear and convincing evidence. *Id.* at 102.

Harris then addressed the court. *Id.* at 131. He apologized to the victim's family and expressed his years' long battle with drugs and addiction. *Id.* at 131-132. He asked for mercy. *Id.* at 133.

The court imposed the following sentence: Involuntary Deviate Sexual Intercourse—10 to 20 years imprisonment; Robbery counts, all—10 to 20 years, concurrent; Strangulation—5 to 10 years, consecutive; Criminal Trespass—3 and-a-half to 7 years, concurrent with the strangulation sentence; followed by a consecutive term

7

of 5 years probation on the conviction for Indecent Assault by Force.. *Id.* at 135-136. This resulted in an aggregate sentence of 15–30 years imprisonment followed by 5 years probation. *Id.* at 136.

## V. Discussion

### A. The Trial Court Did Not Abuse Its Discretion When It Denied Harris' Request for New Counsel on the Day of Trial

Appellate courts apply an abuse of discretion standard when reviewing a trial court's refusal to appoint new counsel. *Commonwealth v. Wright,* 961 A.2d 119, 134 (Pa. 2008); *Commonwealth v. Spotz,* 756 A.2d 1139, 1150 (Pa. 2000); *Commonwealth v. Tyler,* 360 A.2d 617, 619 (Pa. 1976). "Where, as here, there is no dispute that trial counsel is fully prepared to proceed with trial and is competent, appointment of new counsel is required only where irreconcilable differences between the defendant and counsel are shown." *Commonwealth v. Floyd,* 937 A.2d 494, 497 (Pa. Super. 2007); Pa. R. Crim. P. 122(C). Indigent defendants are entitled to free counsel but not to free counsel of their own choosing. *Commonwealth v. Cook,* 952 A.2d 594, 610 (Pa. 2008); citing *Commonwealth v. Chumley,* 394 A.2d 497, 507 n.3 (Pa. 1978).

The question whether irreconcilable differences exist depends on three factors: "(1) the extent of the conflict; (2) the adequacy of the court's inquiry into the conflict; and (3) the timeliness of the defendant's motion for new counsel." *Commonwealth v. Cook,* 952 A.2d 594, 613 (Pa. 2008). Notably, "general misgivings" about the extent of a lawyer's preparation does not qualify as an irreconcilable difference. *Id.*

Here, the record does not support a finding that the trial court abused its discretion when it refused to appoint new counsel on the day of trial. Harris had previously objected to his first-appointed counsel because she was a woman. Tr. 9/05/2023 at 8-9. After the Defenders replaced his first attorney with Mr. Settles, Harris

8

waited until the day of trial to object. *Id.* at 4-5. Harris did not object because Mr. Settles was unprepared. He objected because Mr. Settles had given him an honest opinion based on years of professional experience of how the jury would weigh the evidence. *Id.* at 11. There was no indication Mr. Settles – having given his professional opinion and having received Harris directive to proceed to trial – would not zealously represent his client. The trial court did not abuse its discretion when it denied Harris' request for new counsel on the day of trial.

## B. The Sentencing Court Properly Designated Harris a Sexually Violent Predator

Appellate courts apply a "clear and convincing evidence" standard when reviewing a sentencing court's designation of a defendant as a Sexually Violent Predator ("SVP"). *Commonwealth v. Flacks,* 331 A.3d 687, 692 (Pa. Super.2025).

Sentencing Courts are charged with designating a defendant as an "SVP" if the sentencing court finds by clear and convincing evidence that the defendant (a) suffers from a mental abnormality or personality disorder that (b) makes them likely to engage in predatory sexually violent offenses. *Id.*

Here, the sentencing court properly designated Harris an SVP. SAOB Expert Dr. Siegler testified that Harris' criminal history, "deeply ingrained and rigid dysfunctional thought process," limited capacity for relationships, lack of concern for others based on repeated offending behavior, impulsivity, and non-existent prior relationship to the victim supported his SVP designation. *Id.* at 31-33, 35. Dr. Siegler underscored that Harris had sexually assaulted a stranger impulsively as he roamed through a commercial office building initially intending on only theft. *Id.* at 37-38.

9

## C. Sentencing

Harris cobbles together a hodgepodge of complaints about the sentence imposed, suggesting none have merit. He claims the trial court erroneously imposed a sentence of 15-30 years imprisonment, impermissibly considered Harris' prior arrests, impermissibly considered media reports and victim impact testimony, and failed to consider Harris' history with addiction as a mitigating factor. These arguments fail.

"It is well established that the Sentencing Guidelines are purely advisory" and are "only one factor the court may consider in imposing a sentence." *Commonwealth v. Yhasz*, 923 A.2d 1111, 1118 (Pa. 2007). "Bald allegations of excessiveness, unaccompanied by a plausible argument that the sentence imposed violated a provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing scheme, are insufficient to raise a substantial question." *Commonwealth v. Lee*, 876 A.2d 408, 412 (Pa. Super. 2005). A victim impact statement, moreover, may be presented before sentencing to detail "the physical, psychological, and economic effects of the crime on the victim and the victim's family." *Commonwealth v. Eldred*, 207 A.3d 404, 408 (Pa. Super.2019), *quoting Commonwealth v. King*, 182 A.3d 449, 455 (Pa. Super. 2018).

The court considered both aggravating and mitigating factors when sentencing Harris. Sentencing at 133-134. The court also considered the SVP designation, the time of day, and the impact on the victim. *Id.* The victim slept with a weapon after she was assaulted. *Id.* at 115-116. Her anxiety frayed her relationships with her family. *Id.* at 116-117. She can no longer work in the city. *Id.* at 117. Harris destroyed the victim's life. *Id.* The court did not abuse its discretion in sentencing Harris to 15 to 30 years imprisonment followed by 5 years of probation. *Id.* at 136.

10

## D. Complaints about the Evidence

The court is reminded of Judge Aldisert's pithy observation about appeals that raise as many as six, seven, eight, nine, and ten issues: "it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors... [W]hen I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them." *Commonwealth v. Showers*, 782 A.2d 1010, 1016 (Pa.Super. 2001) (*quoting United States v. Hart*, 693 F.2d 286, 287 n. 1 (3d Cir.1982)).

Harris complains about the weight, nature, and sufficiency of the evidence. These arguments are without merit. The verdict was not against the weight of the evidence. A verdict is against the weight of the evidence only where it is so contrary to the evidence that it "shocks the trial court's sense of justice." *Commonwealth v. Clemons,* 200 A.3d 441, 463 (Pa. 2019). "Because the trial judge has the opportunity to hear and see evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge" in analyzing whether the verdict went against the weight of the evidence. *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013); *quoting Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000).

Here, the DNA match, the surveillance video that depicted Harris, and the victim's credible testimony about how he forced her to engage in deviate sexual intercourse support the verdict. It was just and did not shock the trial judge's conscience. Tr. 9/6/2023 at 49, 50-52, 55-62, 147, 155, 156, 160; Tr. 9/7/2023 at 59, 67-68; Tr. 9/12/2023 at 20-29.

Harris next complains the court improperly allowed the District Attorney to play the 911 call to the jury. Harris did not object at trial. The issue is waived on appeal.

11

*Commonwealth. v. Piper*, 328 A.2d 845, 847 (Pa. 1974) (issues not raised at trial cannot be raised for first time on appeal); Pa. R.A.P. §302.

Harris also complains the court erred where it failed to set aside the verdicts for insufficient evidence. When considering a sufficiency of evidence claim, appellate courts determine whether all the evidence admitted at trial and all reasonable inferences, taken in light most favorable to the Commonwealth, could allow the factfinder to find each element of the offenses beyond a reasonable doubt. *Commonwealth v. Hodge,* 658 A.2d 386, 387 (Pa.Super. 1995) (*citing Commonwealth v. Jackson*, 485 A.2d 1102, 1103 (Pa. 1984)). For the reasons set forth above in the weight of the evidence discussion, Harris' appeal for insufficiency is without merit.

### E. Mistrial

Harris' alleges the Court erred by not granting a motion for mistrial. Harris filed a *pro se* motion for mistrial on February 27, 2024 – five months after his trial concluded. The motion (a) rehashes his complaints about the court's refusal to appoint new counsel on the eve of trial and (b) asserts trial counsel was ineffective during the trial. The court addresses above Harris' complaint about the court's refusal to appoint new counsel on the eve of trial. Harris' complaint about the ineffectiveness of trial counsel during the trial must wait for PCRA review. *See Commonwealth v. Watson,* 310 A.3d 307, 310–11 (Pa. Super. Ct. 2024) (trial and appellate courts should generally not entertain claims of ineffectiveness on direct appeal).

### F. The Seating of An Alternate Juror

Lastly, Harris complains the trial court improperly sat an alternate juror. Harris failed to object after the court interviewed the original juror. The issue is waived.

12

On Friday, September 8, 2023, after approximately ¾ of a day of deliberations, the jury informed the court it wanted to return Monday but that one of the jurors – juror 7 – had a conflict. The court informed Harris outside the presence of the jury that there were two options: replace juror 7 with the alternate, juror 13, or delay the trial until juror 7 could return. Harris initially expressed a preference to postpone the trial until juror 7 could return. Tr. 9/8/23 at 22. The court then interviewed juror 7 in Harris' presence and discerned juror 7 could not return until the following Thursday. *Id.* at 24. The court decided under that circumstance to excuse juror 7 and seat jury 13. Harris did not object. *Id.* at 25. Any issue pertaining to the seating of the alternate is waived on appeal.

## VI. Conclusion

For the reasons set forth above, the Court should affirm the judgment of conviction and sentence.

BY THE COURT:

Christopher R. Hall

_____

Christopher R. Hall, J.

13